# KRUM & PETERS v. WILLIAM MERSHER.

116    17
19 SC 504

ERROR TO THE COURT OF COMMON PLEAS OF LEHIGH COUNTY.

Argued February 17, 1887—Decided April 11, 1887.

By articles under seal M. sold to K. and P. his one half interest in the leasehold of a slate quarry, with certain personal property used in the working thereof, part of the purchase money being paid in cash, the balance and larger part payable in monthly instalments, " out of the clear proceeds, that is after deducting all expenses. And out of the clear proceeds cash in hand he shall receive the balance that is out of the one-half. Should the quarry prove a failure that no proceeds should be in hands of the second party, or that they should abandon the quarry, believing that the quarry would not be a paying one or a profitable one to them in their estimation, and if the quarry had not netted any clear profit to the second party at abandoning said quarry, then the second party shall not be responsible for any further payment and this agreement shall be null and void and of no effect." After several months' operations the purchaser, with the owner of the other one half interest in the leasehold, abandoned the quarry, on the ground that no profits had been made, or could be made, as they believed, by the working thereof. In an action to recover purchase money unpaid, the Court instructed the jury that if they found from the evidence that the defendants when they abandoned the quarry, by ordinary business enterprise could have worked it with a profit, and that it was not given up in good faith, the plaintiff would be entitled to their verdict.

*Held*, that this was error, and that the test of the right of the defendants to terminate the contract was the fact that they had made no profit and they believed that the quarry was not a profitable one to work.

Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

No. 93 July Term, 1886, Sup. Ct.; court below, No. 67 November Term, 1884, C. P.

William Mersher owned a half interest in a leasehold of a slate quarry on the lands of M. C. Hirsch, other parties owning the other half interest, and on October 20, 1883, Mr. Mersher sold his interest to W. P. Krum and B. F. Peters by an agreement under seal containing the following:

The party of the first part agrees to sell to the party of the

second part one half interest of a certain lease which he holds on the property of M. C. Hirsch, situated in Washington township, Lehigh county, Penn., with all the slates on bank . . . . . the said half interest Wm. Mersher has granted and sold to the said W. P. Krum and B. F. Peters for a certain sum conditioned for the said sum shall be sixteen hundred dollars, of which sum two hundred dollars is to be paid at the above date and the balance to be paid monthly out of the clear proceeds, that is, after deducting all expenses. And out of the clear proceeds cash in hand he shall receive the balance that is out of the one half. Should the quarry prove a failure that no proceeds should be in hands of the second party, or that they should abandon the quarry, believing that the quarry would not be a paying one or a profitable one to them in their estimation, and if the quarry had not netted any clear profit to the second party at abandoning said quarry, then the second party shall not be responsible for any further payment, and this agreement shall be null and void and of no effect.

The purchasers under this agreement paid the cash payment, went into possession with the other owners under a new· and substituted lease from the landowner and worked the quarry from October, 1883, to June, 1884, when it was abandoned by all the lessees.

In October, 1884, Mersher instituted an action of Covenant against Krum and Peters upon the agreement, assigning as breaches that, although the said quarry was a paying and profitable one, yet the defendants had not worked it and paid the monthly instalments, nor did they abandon the quarry, as provided and covenanted in the agreement, but had surrendered the lease so assigned to them to the lessor, M. C. Hirsch, and kept and retained for their own use all the said property, etc. The pleas were *non est factum*, covenants performed *absque hoc*, payment, with notice of defalcation.

On the trial, the plaintiff proved the lease and the agreement of sale and followed with evidence tending to show, *inter alia*, that no payments had been made except the $200 cash payment; that the quarry at the time that it was abandoned might have been worked with profit, but was not worked skillfully when it was worked, and that it was not

abandoned in good faith ; but no evidence was produced that any profit was made. The plaintiff being on the stand :

*Q.* What was the value of this property and the machinery on these premises when they left and gave up to Hirsch? Objected to.

The Court : The plaintiff has offered to show that the abandonment of the quarry by the defendants was not in good faith, and that the quarry was in a condition to have been worked profitably. In addition to that, they propose to show that, when the defendants did abandon the quarry, they sold or carried away a portion of the machinery and personal property, which the plaintiff had transferred to them by the written agreement ; and they seek to show the value of the property thus carried away, with a view of recovering for it, in addition to the demand to recover for what the profits were or would have been if the quarry had been properly worked ; the plaintiff's position being that, upon the abandonment by the defendants, the agreement as stated in it was null and void, and that the plaintiff's right to the quarry, machinery and personal property there were then revived. To this the defendants object as incompetent and irrelevant and not admissible under the pleadings, which objection is overruled, and a bill sealed for the defendants.[5]

*A.* It was worth $5,000 to any party.

The defendants introduced evidence showing that the material was of such a quality that the slates were not marketable ; that they had given the quarry a fair trial ; that exclusive of the money laid out by themselves for new machinery, their total expenditures exceeded the value of the slate quarried by nearly $2,000, and that, after notice to the plaintiff, the lease was surrendered to the lessor because the defendants believed the quarry could not be operated with profit.

The defendants requested the Court to charge that under all the evidence the verdict should be for the defendants, which was refused.[1]

The Court, Edwin Albright, P. J., charged the jury in part as follows :

It was argued by plaintiff's counsel that there would be a profit if you did not take into account the machinery and labor. In the opinion of the Court that argument is untena-

Charge of the Court below.

ble.   There was no profit.   The plaintiff has not shown that there was any profit, nor does the defendants' evidence show any profit during the time Krum & Peters worked the quarry. The agreement says out of the profit Mersher is to be paid, and you have the fact that it is not proved there was any profit during the time they worked, and the fact that the agreement was given up.   The plaintiff, then, has no claim against Krum & Peters under his own writing, except on one theory, and the question arising upon that theory will be submitted to you.

The agreement says that if Krum & Peters should abandon the quarry, believing that the quarry was not a paying one or a profitable one to them in their estimation, and if the quarry had not netted clear profits to the second party at the time of abandoning the said quarry, the second party shall not be responsible for any further payments.   The quarry was given up, but not with the consent of Mr. Mersher.   They had a right to give it up under the writing of Mr. Mersher.

[The allegation of the plaintiff is that the agreement implies that the quarry was to be worked in good faith; that the quarry might have been worked so as to render a profit. I say to you that when this lease was given up in June, 1884, if it is proved that at that time by ordinary diligence and ordinary business enterprise and capacity it might have been made to pay a profit, Mr. Mersher may recover, because there is implied in this agreement a covenant or understanding that they shall work it in an ordinary workmanlike manner.   Mersher's pay depended upon the profits of the quarry, and therefore the lessees, Krum & Peters, had a right to give up the lease if they in good faith believed it could not be made to pay.   The plaintiff says they did not give it up in good faith ; that they gave it up from some other motives, and alleges that at the time the lease was given up the quarry might have been worked with profit by the defendants.   If that is proved the plaintiff may recover.] [2] . . . . .

If the material in the quarry was as bad as the defendants say it is, very likely you will come to the conclusion they could not work the quarry with a profit.   This the plaintiff denies, and says that the stone there was as good as the average in the region where the quarry was located, and that quarries

Charge of the Court below.

there could be operated with a profit. The lease was given up in June, 1884. If the plaintiff has satisfied you that the quarry, when the lease was given up, was of such a kind and the material was of such a quality, and the quarry itself was of such a character as to be workable with profit, the plaintiff can recover. If that is not shown, the plaintiff has no case. If you consider all the evidence on that question, and you are convinced that the quarry could have been worked with profit at the time it was given up, the plaintiff can recover, and in that event he may recover all that is owing to him under the stipulation to give him $1,600, $200 of which he already has. It is not enough for the plaintiff in order to recover, to show that the defendants gave up the quarry and nothing more, because they reserved by the writing the right to give it up. [The plaintiff can recover on the ground, and on that ground only, that he has satisfied you that when they gave up the lease the quarry might have been worked with a profit.] [3] . . . .

[You will take the case and inquire as to the main question, whether the plaintiff has shown that the defendants, when they gave up the lease, by ordinary business enterprise could have worked the quarry with a profit, and that it was not given up in good faith, and if you find that issue in favor of the plaintiff, he will be entitled to your verdict for whatever may appear to be due under the explanations I have given to you.] [4] . . . .

To this charge and the answers to their point the defendants excepted, and on verdict and judgment for the plaintiff they took this writ, assigning for error :

1. The answer to the defendants' point. [1]
2. The part of the charge in [ ] [2]
3. The part of the charge in [ ] [3]
4. The part of the charge in [ ] [4]
5. The admission of plaintiff's offer. [5]

*Mr. Edward Harvey* and *Mr. John D. Stiles* of *John D. Stiles & Son* (*Mr. Levi Smoyer* with them), for the plaintiffs in error :

1. The first four assignments are discussed together. The payment of the balance of the consideration was expressly restricted to the one half of the net profits to be realized. By

the term "profits" is meant the net return to the capital invested after deducting all expenses. As there were no profits there was no fund out of which payment could be exacted: Williams v. Hatheway, L. R. 6 Ch. Div. 544; Chambers v. Jaynes, 4 Penn. St. 39; 1 Whart. Con. 598.

By its very terms the contract made the defendants the exclusive and absolute judges of the conditions under which it should become operative. The test furnished was not the actual workable character of the quarry, nor whether it could be made to pay by others, nor whether witnesses or a court and jury should be of opinion that it could be worked profitably, but the belief or opinion of the defendants as to whether it would be profitable to them. The obligation to perform was made dependent upon the contingency that the defendants would conclude that the quarry could be worked at a profit; only on the happening of that contingency did the obligation to perform arise: Benninger v. Hankee, 61 Penn. St. 343. If this be the true construction, the defendants were the exclusive judges of the conditions permitting them to abandon: Grafton v. Railway Co., 8 Exch. 699; Taylor v. Brewer, 1 M. & S. 290; Andrews v. Belfield, 2 C. B., N. S., 779 (89 E. C. L. R.); McCarron v. McNulty, 7 Gray, 139; Brown v. Foster, 113 Mass. 136; Zaleski v. Clark, 44 Conn. 218; Bernard v. Cushing, 4 Met. 230; Nelson v. Von Bonnhorst, 29 Penn. St. 352; Hartman v. Blackburn, 7 Pittsb. L. J. 140; Gray v. Railroad, 11 Hun 70; Gibson v. Cranage, 39 Mich. 49; Hoffman v. Gallaher, 6 Daly 42; Barlow v. Thompson, 46 Ind. 384; and consider the case of Singerly v. Thayer, 108 Penn. St. 291.

It is true that in some of the cases it is said that the defendant must not act in bad faith or capriciously; but by these terms it is meant that the reason given by the defendant for not being satisfied must not be so flagrantly and obviously unjust as to become conclusive evidence that it was not in point of fact the operative cause of his refusal to perform.

Not only was the case submitted to the jury upon the allegation of bad faith unsupported by any evidence, but the court said that "if it is proved that at that time by ordinary diligence and ordinary business enterprise and capacity" the quarry "might have been made to pay a profit," then the

plaintiff could recover. There is a contradiction here. Bad faith would not excuse non-performance, and good faith would not excuse it, if the jury were convinced that the quarry might have been made to pay a profit. And this view is taken, not from anything in the contract, but because of an implied covenant that defendants should work the quarry in a workmanlike manner. But "we cannot make a contract for them that is contrary to their plain intentions, without violating the first principles of freedom and the very nature of contract relations:" LOWRIE, J., in Nelson v. Von Bonnhorst, *supra*.

2. The 5th assignment relates to the admission of evidence. What had the value of the property to do with the performance or enforcement of the written contract? The liability was not dependent upon value. The value afforded no light to the true meaning of the contracting parties.

*Mr. R. E. Wright* of *R. E. Wright's Sons* (*Mr. C. J. Erdman* with them), for defendant in error.

1. From the terms of the contract the following legal proposition results: That Mersher having sold his property to Krum & Peters for a consideration which was to be paid out of the income from the products of the quarry, there was an implied covenant on the part of Krum & Peters that they would in good faith work the quarry with proper diligence, to the end that Mersher might receive the consideration for his sale.

In support of this proposition: Lyon v. Miller, 24 Penn. St. 393; Watson v. O'Hern, 6 W. 362; Koch's & Balliet's App., 93 Penn. St. 434; from which authorities it follows that so long as the plaintiffs in error retained the quarry and did not avail themselves of their right under certain conditions to abandon it, they must work it diligently, and that if the failure to realize the profits, out of which we were to be paid, arose from their clear breach of their implied covenant, they were chargeable with such profits as they might have realized through a proper performance of it.

II. The plaintiffs in error had the conditional right to abandon the quarry, to wit: "Should the quarry prove a failure, that no proceeds should be in the hands of the second

party, or that they should abandon the quarry, believing that the quarry would not be a paying one or a profitable one to them in their estimation, and if the quarry had not netted any clear profit to the second party at abandoning said quarry, then the second party shall not be responsible for further payment," etc., etc.

The meaning of this clause, we submit, is this: "If the quarry has not netted a clear profit," and, "in their estimation," it "would not be a paying one or a profitable" one, they may abandon it and be relieved from liability. Of course this does not mean that they may, out of mere obstinacy and caprice and without honest cause, abandon the quarry, keep the personalty and crowd the defendant in error out of compensation.

In support of the legal proposition enforced by the court: 1 Whart. Con. 787; Singerly v. Thayer, 108 Penn. St. 298; 1 Pars. Con., 542; Andrews v. Belfield, 2 C. B., N. S., 779.

OPINION, Mr. JUSTICE GREEN:

We think the learned court below was in error in their interpretation of the clause of the contract which subjected its obligatory force to the will of the grantees. The language of this portion of the agreement is certainly inartistic and indeed uncouth, but it is not unintelligible. It is practically conceded in the charge that "Krum & Peters had a right to give up the lease if they in good faith believed it could not be made to pay." We agree with this, but, as we understand the charge, this is not the question upon which the case was given to the jury. On the contrary, the court said, " I say to you that when this lease was given up in June, 1884, if it is proved that at that time, by ordinary diligence and ordinary business enterprise and capacity it might have been made to pay a profit, Mr. Mersher may recover, because there is implied in this agreement a covenant or understanding that they shall work it in an ordinary workmanlike manner." And again: "If the plaintiff has satisfied you that the quarry when the lease was given up, was of such a kind and the material was of such a quality, and the quarry itself was of such a character as to be workable with profit, the plaintiff can recover. . . . . If you consider all the evidence on that question and you are

convinced that the quarry could have been worked with profit at the time it was given up, the plaintiff can recover." The same idea was repeated at the close of the charge where it was characterized as the main question.

According to this view of the defendants' obligation, it did not depend in any degree upon their own estimation or belief as to their ability to work the quarry at a profit, nor even upon the actual results of the best and most faithful efforts they could put forth with whatever capital or facilities they possessed. Instead of that, the crucial test of liability as stated to the jury was the *possibility* of the quarry being worked at a profit with ordinary diligence by anybody or by any means. That of course is a mere question of opinion to be proven by witnesses who would testify as to *their* belief on the subject, and who might thus induce a jury to find according to *their* belief as to what *could* be done with the quarry. Such opinions as this are easily obtained from willing friends of the interested parties, as unhappily is the case in too many other kinds of cases. They cost nothing to the witness. He does not go through the hazardous ordeal of actually conducting at his own expense the practical operations concerning which he testifies. He ventures nothing but an opinion and in that he assumes no risk. Upon reading the testimony in this case we find it was tried upon this principle precisely. Witnesses were examined on behalf of the plaintiff to prove that the quarry *could* be worked at a profit and they gave their opinions to that effect. It was proved most clearly for the defence that in point of fact no profit was made, but on the contrary a heavy loss, and there was no proof in the case that in reality any profit was made, yet the jury were instructed that if they found that the quarry could be worked at a profit the plaintiff was entitled to recover. But the agreement provided for a very different standard of liability. The language is, "Should the quarry prove a failure that no proceeds should be in hands of the second party, or that they would abandon the quarry, believing that the quarry would not be a paying one or a profitable one to them in their estimation, and if the quarry had not netted any clear profit to the second party at abandoning said quarry, then the second party shall not be responsible for any further payment, and this

agreement shall be null and void and of no effect." All this verbiage simply means that if Krum & Peters made no profit and believed that the quarry was not a profitable one to work they could abandon the quarry and the contract was a nullity. In other words, the test of their right to terminate the contract, was the fact that they had made no profit, and their belief that the quarry was not a profitable one to work. It was conceded they had made no profit, and the proof was most ample, that they believed the quarry to be an unprofitable one to work, and they did actually abandon it and surrendered the lease. Now according to the terms of their contract they were entitled to have their liability tried by these tests. Did they make no profit and did they really believe the quarry an unprofitable one? If so they were not liable and there could be no recovery. They had an undoubted right to contract in that way if the other party were willing, as he certainly was. The books abound with authorities which prove this, but a simple reference is sufficient : Singerly v. Thayer, 108 Penn. St. 291. In a contract for an elevator, the words were " warranted satisfactory in every respect." The court below charged the jury that if they were of the opinion that the elevator was reasonably fit for the purpose for which it was intended and the defendant ought to have been satisfied with it, the verdict might be for the plaintiff. We held that this was error. The fair inference from the contract was that the elevator was to be satisfactory to the defendant, and while it could not be rejected for mere caprice, yet a *bona fide* objection by him to its working was a sufficient defence. The present Chief Justice said, speaking of the charge of the court below, " In other words it may have been wholly unsatisfactory to him, yet if the jury thought he ought to have been satisfied he was bound to accept it. In effect, that is, it need not have operated to his satisfaction in any respect, but to the satisfaction of the jury which might be called to pass on the rights of the parties. . . . . . He did not agree to accept what might be satisfactory to others, but what was satisfactory to himself. This was a fact which the contract gave him a right to decide. He was the person negotiating for its purchase. He was the person who was to test it and to use it. No other persons could intelligently determine whether in every respect he was satisfied

therewith." The foregoing reasoning applies with a still greater force to the present case. Krum & Peters were the persons who were to work the quarry. It was they who were to pay all the expenses and incur all the risk. This they must do in any event, and hence they would be most anxious to provide for a means of extrication from what might prove to be a ruinous loss. For that very reason they stipulated for an absolute privilege to terminate the contract if they made no profit and believed the quarry unprofitable to work. They did not choose to be subject to the opinions of others in this most important matter, and in this they were wise. Doubtless they knew, as nearly all men in the business world do, that the making of profits—on paper—is an affair of the simplest and easiest character. Thousands of men of good business capacity are being constantly led on to loss and great numbers to ruin, by the seductive array of profits, on paper, which are never realized. Against the possibility of having their obligation to continue a losing contract, to depend upon the easily obtained and loosely formed opinions of strangers, they took care to provide by their agreement, and they are now entitled to the protection for which they bargained. Of course they could not from mere caprice and without reason say they were losing, and thus terminate the contract. But that is a very different matter from being obliged to submit to the mere opinion of strangers, whether witnesses or jurors, on the question of a possible profit in conducting their operations. These views sustain the second, third and fourth assignments of error.

We also sustain the fifth, as we do not see the relevancy of the testimony there offered and admitted, and we are unable to discover any evidence of bad faith on the part of the defendants.

Judgment reversed.