JOHN B. CONOMOS, INC., Appellee,

v.

SUN COMPANY, INC. (R & M), Appellant.

Superior Court of Pennsylvania.

Argued June 17, 2003.

Filed Aug. 22, 2003.

Michael P. Robic, Pittsburgh, for appellant.

Sheldon L. Keyser, Pittsburgh, for appellee.

BEFORE: HUDOCK, LALLY–GREEN, and CAVANAUGH, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 This is an appeal from a judgment following a non-jury verdict in favor of Appellee, John B. Conomos, Inc. ("Conomos"), and against Appellant, Sun Company, Inc. (R & M) ("Sun"). We hold that, absent fraud or unconscionability, a bad faith breach is an insufficient basis for invalidating a limited liability provision where the parties had agreed by contract that one party (the breacher) could cancel the contract at any time at its option whether or not the other party was in default of its obligations, where the breacher cancelled the contract, and where the limitation of liability damages applied to cancellation. However, the trial court's refusal to enforce the limitation of damages provision in the contract was harmless error under the facts of this case. We affirm.

¶ 2 The facts laid out by the trial court are as follows:

This matter was tried before me non-jury on various dates between January 9th and January 26, 2001. The issue involved a contract between Plaintiff [Appellee] ("Conomos") and the Defendant [Appellant] ("Sun") for painting of industrial piping at Sun's Marcus Hook, Pennsylvania Refinery. Conomos brought suit to recover what it claimed to be the funds due it under the contract, as well as claiming exemplary damages under the Contractor and Subcontractor[ ] Payment Act [73 P.S. § 501 et seq.]. After the close of testimony, Conomos requested leave to amend its complaint under Rule 1033 to also allege fraud by Sun.

The facts show that in May, 1996 [unless otherwise indicated, all dates are in 1996] Conomos was invited to bid on this painting project and attended a pre-bid meeting at which interested bidders were shown the facility and given information about how the surface of the pipes was to be prepared before paint was applied. At that meeting, bidders were shown examples of what Sun was expecting as surface preparation, which related to industry standards developed by the Steel Structures Painting Council.[1] The "examples" were pieces of painted pipe or angle iron from which paint in varying degrees had been removed. The Steel Structure[s] Painting Council standards are referred to as "SP" plus a numeric designation indicating the degree of surface preparation. They range from washing (SP–1); to hand tool cleaning (SP–2); to use of scrapers and light use of a power tool known as a "needle gun" (SP–3). Sun added some additional requirements to SP–3, which it called SP–3 modified. That modification contemplated light use of a "needle gun" for a few passes to see if the old paint was still adherent. The numeric designation continued on up to SP–11, which required removing **all** paint and leaving a paint free, shiny surface. Obviously, subjective evaluation plays a significant role in whether these standards are met. Therein lies the nub of this dispute. Conomos contends that the needle gun use required by Sun's inspector was excessive and went well beyond the standard of paint flaking off with a few passes of the needle gun which was the SP–3 modified standard.

Conomos was the successful bidder on Sections 7, 8, and 9 of the contract and began work on June 10, 1996. The inspector on the project was a Mr. Don Desroches, who early on found the preparation of the pipe by Conomos to be unacceptable. This began on the second or third day of the project, and is reflected in the construction notes of the Conomos foreman, Mr. Ron Hester, who on June 12, noted ("Don is wanting everything off") and on June 17th, ("Told him he has to leave up or we are moving out.").

There was no easing up and Desroches continued to impose inspection standards and surface preparation that Conomos believed to be unacceptable and beyond the scope of the industry standard. It complied with his requirements, but incurred additional expense as a result. Conomos wrote to Sun on July 15th, and indicated its problem and asked for consideration of its concerns including an upward revision of the contract price. When it received no response, it left the job on July 25th. Notwithstanding this action by Conomos, no response was received from Sun and a second letter was sent August 6th, and a third on August 29th. No meeting or resolution occurred until September 9th when Sun, by letter, cancelled the contract. According to its letter, Sun believed it owed Conomos the full price for area 7, that is, $23,037 plus one-half of area 8, that is, $27,712, less what it would cost Sun to finish the balance of area 8 and all of 9. Sun calculated that to be $18,739. The net due Conomos under the foregoing would

---

1. The Steel Structures Painting Council changed its name in 1997 to The Society for Protective Coatings. (http://www.sspc.org/about) (last visited July 28, 2003). The Internet website of SSPC describes the association as one "founded in 1950 as ... a non-profit professional society concerned with the use of coatings to protect industrial steel structures." *Id.*

be $32,010. Sun did indeed pay that amount to Conomos over 1 year later on August 28, 1997.

Conomos thereafter filed this suit for the balance due under the contact [sic], plus additional charges for the additional preparation required, as well as a claim under the Contractor and Subcontractor[ ] Payment Act. After cancellation of the contract, Sun awarded the completion thereof to MP Industrial Coatings (MP), the next lowest bidder to Conomos. The evidence showed that MP likewise had trouble with Desroches which led to a representative of the paint manufacturer acting as mediator over whether the painting done by MP was adequate. The mediator found the job by MP to be acceptable.

Trial Court Memorandum Order and Non–Jury Verdict, 6/26/01, at 1–4 (citations omitted) (footnotes omitted).

¶ 3 The trial court found that Sun breached the contract with Conomos, and characterized the breach as a "bad faith breach." The court refused to permit Conomos to amend its complaint to allege fraud, stating that "I believe this effort is entirely too late. The factors on which Conomos attempts to assert this claim are not viable." *Id.* at 8. The court also rejected Sun's counterclaim for the costs incurred by Sun in completing the areas Conomos left unfinished. *Id.* at 5, 7. The trial court awarded Conomos $32,892.23 as contractual damages for extra services rendered and lost profits. *Id.* at 7. In addition, the court assessed $18,748.44 in penalties, and $12,000.00 in reasonable attorneys' fees, under section 512 of the Contractor and Subcontractor Payment Act ("CSPA").[2] *Id.* at 7–8. The sum of

damages awarded for contractual claims and as section 512 remedies in the trial court's original verdict came to $63,640.67. *Id.* at 8.

¶ 4 Following the trial court's verdict awarding Conomos $63,640.67 in damages, both parties filed post-trial motions. Trial Court Memorandum Order, 11/13/01, at 2. Sun contended that the trial court's verdict was against the weight of the evidence, which the court rejected. *Id.* at 2–3. The trial court also rejected Sun's claim that any remedies resulting from the breach were subject to the contract's limitation of damages clause, which set the contract price as a ceiling on what Conomos could recover for work completed prior to the end of their contractual relationship. *Id.* at 3–4. The trial court did not find the limited liability clause applicable because the cancellation provision containing the clause was not controlling. *Id.* at 4.

¶ 5 In response to Conomos's post-trial motions, the trial court found that it had overlooked in its original verdict certain invoiced sums of money for services rendered, and accordingly increased its contractual award (of $32,892.23) by $27,026.25, to a total of $59,918.48. *Id.* Accordingly, the trial court reassessed penalties based on this new contractual award to be $40,130.71. *Id.* at 7. The trial court also granted Conomos's claim that the court's original verdict failed to award interest under section 505(d) of the CSPA. *Id.* at 4–5. Because the statute provides that interest will accrue at the same rate as penalties, the interest award came to $40,130.71 as well. *Id.* at 7. The total award, thus, amended the original

---

**2.** The trial court also ordered that Sun pay Conomos "the reasonable expenses incurred by it in the case," without specifying an amount. Trial Court Memorandum Order and Non–Jury Verdict, 6/26/01, at 8. The court stated that if there is a dispute about expenses, "it will be handled in a separate hearing before me." *Id.*

verdict (of $63,640.67) to $152,179.90.[3] *Id.* The trial court also calculated a daily interest and penalty rate of $39.39 to continue to accrue from the date of its order "until the matter is resolved." *Id.*

¶ 6 On June 11, 2002, the trial court issued another order granting Conomos's request for additional counsel fees pursuant to the CSPA, molding the amended award (of $152,179.90) to a total of $173,904.77. Trial Court Order, 6/11/02. This included $8,271.90 in additional interest and penalties on the $59,918.48 contractual claim, at $39.39 per day, for the period from November 13, 2001 to June 11, 2002; $8,452.97 in additional expenses; and $5,000.00 in additional attorneys' fees. *Id.* The trial court again ordered that interest and penalties will continue to accrue at the same daily rate of $39.39 as of the court order until the matter is resolved. *Id.* The trial court also denied Conomos's requests for punitive damages and post-judgment interest thereon based on Conomos's claim of fraud. *Id.* This appeal followed.

¶ 7 Sun raises the following two issues on appeal:

1. Can a court ignore and decline to apply the limitation of damages provisions agreed to by the parties and contained within their contract which limits or waives certain common law damages and certain waiveable damages under the Contractor and Subcontractor Payment Act, 73 P.S. § 501 *et seq.*, merely by finding Sun Company, Inc. to be a "bad faith breacher" of the contract?

2. Whether the court erred in denying Sun Company's Motion for Judicial Admission where Conomos admitted in its Complaint and Amended Complaint that

the contract between the parties had been terminated, and attached a copy of the contract to its Complaint and Amended Complaint, given that the word "termination" has a specific meaning and provides particular rights to the parties as part of the contract.

Appellant's Brief at 6.

¶ 8 This Court, on appeal from a non-jury verdict, is to determine whether the trial court's findings are supported by the evidence and whether the trial court erred in applying the law. *Roman Mosaic & Tile Co. v. Thomas P. Carney, Inc.,* 729 A.2d 73, 76 (Pa.Super.1999). The evidence is considered in the light most favorable to the verdict winner, and the trial court's findings are given the same weight and effect on appeal as jury verdicts. *Baney v. Eoute,* 784 A.2d 132, 135 (Pa.Super.2001). Credibility determinations and consideration of conflicts in the evidence are within the purview of the trial court and such evidence should not be reweighed on appeal. *Adamski v. Miller,* 545 Pa. 316, 681 A.2d 171, 173 (1996). We do not disturb findings of fact simply because this Court would have reached a different conclusion, but rather determine whether there is competent evidence in the record that a judicial mind could reasonably have determined to support the finding. *Bethlehem Steel Corp. v. Litton Indus., Inc.,* 507 Pa. 88, 488 A.2d 581, 586 (1985).

¶ 9 The first issue is whether the trial court should have enforced the limitation of damages clause in the contract, despite its finding of Sun's "bad faith breach." When there is ambiguity, determining contractual intent is a fact-intensive finding subject to an abuse of discre-

---

**3.** The trial court did not amend the $12,000.00 originally awarded for reasonable counsel fees. Trial Court Memorandum Order, 11/13/01, at 7. Thus, the trial court

assessed its award of $152,179.90 by summing $59,918.48 for contractual claims, $80,261.42 for penalties and interest, and $12,000.00 for counsel fees. *Id.*

tion standard of review. *See, id.* at 585–86. On the other hand, the meaning of an unambiguous written instrument is a question of law subject to *de novo* review. *Seven Springs Farm, Inc. v. Croker*, 569 Pa. 202, 801 A.2d 1212, 1215 n. 1 (2002); *Murphy v. Duquesne Univ.*, 565 Pa. 571, 777 A.2d 418, 430 (2001). To the extent that the trial court's findings are predicated on errors of law, we review the court's findings *de novo. Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002).

■ ¶ 10 We start by analyzing the limitation of damages provision that Sun would like enforced. The law of the Commonwealth does not disfavor limitation of liability provisions. *See, e.g., K & C, Inc. v. Westinghouse Elec. Corp.*, 437 Pa. 303, 263 A.2d 390, 393 (1970); *N.Y. State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 387 Pa.Super. 537, 564 A.2d 919, 924 (1989); *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202–04 (3d Cir.1995). Absent unconscionability, limited liability provisions are binding on the parties that fashioned the terms of their agreement. *Vasilis v. Bell of Pa.*, 409 Pa.Super. 396, 598 A.2d 52, 54 (1991).

¶ 11 Here, the contract states: [4]

If Contractor [Conomos] is adjudged bankrupt, becomes insolvent, files for voluntary bankruptcy, is subjected to involuntary bankruptcy proceedings, enters receivership proceedings, or makes an assignment for the benefit of creditors; if Contractor persistently or repeatedly refuses or fails to supply an adequate number of qualified Supplied Personnel or proper materials and equipment; if Contractor fails to perform the Work, or any part thereof, with the diligence necessary to insure its progress and completion as prescribed by the time schedule approved by Owner [Sun] and fails to take such steps to remedy such failure within five (5) days after written notice from Owner is provided, except in cases for which extension of time is provided by Owner; if Contractor fails to make prompt payment to vendors or its Subcontractor(s) for materials, labor, or otherwise; or if Contractor violates any provision of this Contract, then Owner, without prejudice to any other rights or remedies expressly provided herein, may **terminate** this Contract, or any part hereof, by notifying Contractor and shall have the right to take possession of all its property, tangible or intangible, and to take possession of the Work completed under this Contract. In cases of termination, Owner shall be relieved of all further obligations hereunder and Contractor shall be liable to Owner for all costs, in excess of the Contract price, incurred by Owner in completing the Work.

Owner, at its option, may **cancel** this Contract at any time, whether or not Contractor is in default of any of its obligations hereunder. Upon any such cancellation, Contractor waives any claim for damages, including loss of anticipated profits, on account thereof. However, provided that Contractor is not in default of any of its obligations hereunder, Owner agrees that Contractor shall be paid an amount which, when added to all previously paid installments, will equal the sum of all costs properly incurred by Contractor prior to the date of cancellation, plus any earned profit on such incurred costs, but in no event shall such amount be greater than the Contract price. Such earned profit shall

---

**4.** For convenience, the first two paragraphs will be termed the "termination" and "cancellation" provisions, respectively, of the contract. The third paragraph, or the "suspension" provision, does not come into play.

bear the same relationship to such incurred costs as the profit increment of the Contract price bears to the cost increment of such Contract price. Owner shall have the right to verify the amounts of such costs and profit increments through an audit of Contractor's records.

Owner, at its option, may **suspend** the Work of Contractor under this Contract at any time. Upon such suspension, Owner agrees that Contractor shall be paid an amount which will equal the sum of all costs, charges and expenses arising out of such suspension. Such costs, charges and expenses shall be exclusive of anticipated earned profit.

OCIP General Terms and Conditions ¶ 6 (emphases added).

¶ 12 The particular limitation of damages clause that Sun would like us to enforce is in the cancellation provision:

Contractor [Conomos] waives any claim for damages, including loss of anticipated profits .... However, provided that Contractor is not in default of any of its obligations hereunder, Owner [Sun] agrees that Contractor shall be paid an amount which, when added to all previously paid installments, will equal the sum of all costs properly incurred by Contractor prior to the date of cancellation, plus any earned profit on such incurred costs, but in no event shall such amount be greater than the Contract price.

*Id.* The trial court found that the clause was not triggered because Sun's cancellation as a prerequisite to its application was not satisfied. In refusing to enforce the clause, the trial court stated that:

I do not find either [the termination or cancellation provision] controlling since the bad faith effort by Sun to get a "sand blast" job in the guise of a "hand tool" cleaning is neither a termination

nor a cancellation. It is a bad faith breach and Conomos is entitled to all remedies under the law.

Trial Court Memorandum Order, 11/13/01, at 4. As a result, the trial court refused to subject the total damages awarded to the ceiling of $112,350.00 set by the contract price. OCIP Field Services Contract, art. 3.

¶ 13 The record reflects that Conomos believed Sun was more demanding than expected based on the SP–3 modified standards of the contract. Trial Court Memorandum Order and Non–Jury Verdict, 6/26/01, at 2–3, *citing,* Defendant's Exhibit 1, Plaintiff's Exhibit "J." The record shows that Conomos ceased its work at Sun's refinery and communicated its concerns to Sun. *Id.* at 4, *citing,* Plaintiff's Exhibit "L." It shows that Sun's response did not come until after the third letter to Sun, and that in the response, Sun expressed its intent to end the contract with Conomos. *Id.* at 4, *citing,* Plaintiff's Exhibit "L." In the letter, Sun admitted to owing Conomos a total of $32,010.00: $23,037.00, the full price of Area 7, plus $27,712.00 for half of Area 8, minus $18,739.00, the amount Sun calculated would be the cost to complete the unfinished half of Area 8 and all of Area 9. *Id.*

¶ 14 In determining whether the trial court should have limited its total damage award to the contract price, we turn to the question of the "bad faith breach." We will examine, first, whether Sun owed a duty of good faith to Conomos; second, whether that obligation was breached; and third, what implications any breach has on the remaining provisions of the contract, specifically, the limited damages clause.

■ ¶ 15 First, in examining the duty of good faith, we begin by noting that the Commonwealth has accepted the principle in *Restatement (Second) of Contracts*

§ 205 that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Kaplan v. Cablevision of PA, Inc.,* 448 Pa.Super. 306, 671 A.2d 716, 721–22 (1996). Pennsylvania courts impose a general duty of good faith performance on each party in general commercial contracts. *Donahue v. Federal Express Corp.,* 753 A.2d 238, 242 (Pa.Super.2000).

■ ¶ 16 The Commonwealth has also developed in common law what has come to be referred to as the doctrine of necessary implication.[5] This Court in *Daniel B. Van Campen Corp. v. Bldg. & Constr. Trades Council of Phila.,* 202 Pa.Super. 118, 195 A.2d 134 (1963), described the principle as follows:

> The law is clear that "In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract. Accordingly, a promise to do an act necessary to carry out the contract must be implied."

*Id.* at 136–37. Our Supreme Court has recognized this principle of contract law. *See, Murphy,* 777 A.2d at 434 n. 11; *Frickert v. Deiter Bros. Fuel Co.,* 464 Pa. 596, 347 A.2d 701, 705 (1975) (Pomeroy, J., concurring). In the absence of an express term, the doctrine of necessary implication may act to imply a requirement necessitated by reason and justice without which the intent of the parties is frustrated. *Somers v. Somers,* 418 Pa.Super. 131, 613 A.2d 1211, 1214 (1992).

■ ¶ 17 The duty of good faith and the doctrine of necessary implication apply only in limited circumstances. Implied duties cannot trump the express provisions in the contract. *See, Kaplan,* 671 A.2d at 720 ("The court may apply the doctrine of necessary implication [to] imply a missing term ... only when ... it is abundantly clear that the parties intended to be bound by such term."); J. Murray, *Murray on Contracts* § 96C (4th ed.2001). Unequivocal contractual terms hold a position superior to any implied by courts, leaving implied covenants to serve as gap filler. *See,* Murray § 96C. Our Supreme Court has upheld the right of parties to contract as they wish, free to decide not to be "subject to the opinions of others" in how they conduct themselves under their contract. *Krum & Peters v. Mersher,* 116 Pa. 17, 9 A. 334, 336 (1887). *See also, Insley v. State Mutual Life Assurance Co.,* 334 Pa. 368, 5 A.2d 544, 546 (1939) ("[W]ithin any limits the law permits contracts to be made, the law will enforce, according to its terms, any contract made (except as to 'unconscionable provisions' ...) .... 'A covenantor is not to be held beyond his undertaking and he may make that as narrow as he likes.' ") (citations omitted). As "this obligation of good faith is tied

---

5. The covenant of good faith and the doctrine of necessary implication appear to have a related conceptual genesis. *See, e.g., Murphy,* 777 A.2d at 434 n. 11 (observing that the obligation of good faith "is akin to the contract doctrine of necessary implication"); *Shetter v. Welzel,* 242 Pa. 355, 89 A. 455, 457 (1913) (holding that a party is "estopped from doing what would be inconsistent with good faith in the way of obstructing the enjoyment of that which he had granted"); *Zell v. Dunkle,* 156 Pa. 353, 27 A. 38 (1893) (holding that by accepting goods for repair, workmen "must be held to have subjected themselves to an undertaking, implied from the nature of the express contract for repairs, to do what in good faith and common fairness ought to be done for the protection of their customer's goods").

specifically to and is not separate from the [express] duties a contract imposes on the parties," *Murphy*, 777 A.2d at 434 n. 11, it cannot imply a term not explicitly contemplated by the contract. Both the implied covenant of good faith and the doctrine of necessary implication are principles for courts to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract.

■ ¶ 18 In the case of Sun's contract with Conomos, Sun's obligation to inspect Conomos's work—and, if deemed to satisfy the requirements of the contract to approve the work and render payment therefor—is necessary to Conomos's enjoyment of the contract's benefits. *See*, OCIP Field Services Contract, art. 4; OCIP General Terms and Conditions ¶ 11. The contract requires Conomos to perform a specific level of work. *See*, OCIP Attachment No. 5 at 4–5. As the trial court observed, a certain level of subjectivity goes into evaluating the work. Trial Court Memorandum Order and Non–Jury Verdict, 6/26/01, at 2–3. The contractual standard for the required work, however, was specific enough to prescribe the necessary procedures in relation to other levels of work along a spectrum. *See, id.* These objective guidelines created reasonable expectations regarding the basis upon which Sun was to inspect the work. Because the contract necessarily implies that Sun will not defeat Conomos's reasonable expectation that work of sufficient quality will be compensated as agreed, the contract re-

flects that Sun had an implied duty of good faith in the inspection of Conomos's surface preparation and painting.

■ ¶ 19 Second, we turn to whether Sun breached its implied duty of good faith inspection. The trial court found that Sun's foreman demanded a higher level of work than the contract required. *See*, Trial Court Memorandum Order and Non–Jury Verdict, 6/26/01, at 6–7. The court found that because of its "true motivation," Sun did not inspect Conomos's work in good faith.[6] *See, id.* The record reflects that following Conomos's cessation of work, Sun granted the incomplete segments of the job to the next highest bidder, MP Industries. *Id.* at 4. It shows that MP had similar difficulties in satisfying Sun's foreman, and a mediator stepped in and determined that MP's work was acceptable. *Id.*

¶ 20 When an obligation necessary to Conomos's enjoyment of the contract is not expressly provided but implied as a necessary implication of the contract, Sun's good faith performance is necessary to satisfy the implied obligation. Sun's lack of good faith performance, or its bad faith, can result in a breach of an obligation necessarily implied by the contract. As there is competent evidence in the record to support the finding, the trial court did not abuse its discretion in finding that Sun breached its duty of good faith inspection.

■ ¶ 21 Third, we examine the effect of Sun's breach on the other provisions of the contract. In general, when a

6. We note that the motivation itself for Sun's breach is not controlling in causes of action under contract law. Rather, a material defect in performance arising from Sun's "true motivation" is what may result in a breach of a contractual duty. *See, Pittsburgh, Cincinnati & St. Louis Ry. Co. v. Lyon*, 123 Pa. 140, 16 A. 607 (1889). In *Lyon*, our Supreme Court stated that:

> In actions on contract, ... the amount recoverable is limited to the actual damages caused by the breach, the measure being the same whether the defendant fails to comply with his contract through inability, or willfully refuses to perform it. But in torts the rule is different; the motive of the defendant becomes material.

*Id.* at 609.

party fails to satisfy an express contractual obligation, the lack of performance is a breach of the provision creating that obligation. On the other hand, when there is no provision creating an obligation, a failure to act in a certain way amounts to no more than exercise of privileges reserved in the contract. *See, e.g., Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank,* 801 A.2d 1248, 1253 (Pa.Super.2002) (holding that "a lending institution does not violate a separate duty of good faith by adhering to its agreements with a borrower or enforcing its contractual rights as a creditor"); *Baker v. Lafayette Coll.,* 350 Pa.Super. 68, 504 A.2d 247, 256 (1986) (holding that an employer's "obligation [to an employee] to act in good faith extends only to the performance of those contractual duties it has chosen to assume"); *Amoco Oil Co. v. Burns,* 268 Pa.Super. 390, 408 A.2d 521, 524 (1979) (holding that "the duty of good faith and commercial reasonableness is used to define the franchisor's power to terminate the franchise only when it is not explicitly described in the parties' written agreements"). As the good faith and necessary implication doctrines serve to imply terms that the parties would have spelled out had they foreseen their need, a breach of such implied terms is equivalent to a breach of any other provision in the contract.

■■■■ ¶ 22 An unjustified breach of a contract does not subject the breaching party to all remedies recoverable under contract law if the contract provides otherwise. According to the Supreme Court of Pennsylvania:

> Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, **unless the contract provides otherwise,** whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result

from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

*Taylor v. Kaufhold,* 368 Pa. 538, 84 A.2d 347, 351 (1951) (emphases omitted), *quoted in, Ferrer v. Trustees of the Univ. of Pa.,* 573 Pa. 310, 825 A.2d 591, 610 (2002) (as amended July 8, 2003). Absent fraud or unconscionability, courts should not set aside terms on which sophisticated parties agreed. *See, Vasilis,* 598 A.2d at 52. Notwithstanding the characterization of a breach as a bad faith breach or otherwise, the contract may prescribe for the remedies available for such breach. To the extent that the cause of action and remedies remain within the province of contract law, the contract may be binding in the determination of the consequences of a breach. As "[t]he fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties," *Murphy,* 777 A.2d at 429, the contract must be consulted in determining the consequences of such a breach.

¶ 23 To determine the impact of Sun's breach of its implied duty of good faith inspection on the contract's other provisions, we start by looking at the contract itself. The contract provides that Sun may cancel at any time, whether or not Conomos has violated any of its obligations under the contract. OCIP General Terms and Conditions ¶ 6 (cancellation provision). The trial court stated that Sun neither cancelled nor terminated, but breached the contract in bad faith. Trial Court Memorandum Order, 11/13/01, at 4. The record reflects that Conomos and Sun were not in accord regarding the extent of surface preparation and painting required under the contract. In response, Conomos ceased working in order to negotiate an

appropriate adjustment in the contract, an effort that was met with a letter from Sun stating that Sun wished to end its contractual relationship with Conomos.

¶ 24 Sun did not reciprocate Conomos's efforts at salvaging the contractual relationship that had been soured by their disagreement. Under the contract, Sun was not required to. So instead, the contract expressly reserves Sun's privilege to cancel "at its option ... at any time." Sun could have chosen to respond to Conomos's letters to discuss the potential to continue its arrangement with Conomos. It chose, however, not to pursue the contract any longer, a right it had expressly reserved in the contract.[7] Therefore, the trial court erred in imposing upon Sun an obligation to resolve its disagreement with Conomos and, in effect, to remain in the contractual relationship when Sun had the right to cancel at its option at any time.

¶ 25 We now turn to the calculation of damages in accordance with Sun's agreement with Conomos. *See generally, Ferrer*, 825 A.2d at 611 ("In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence."). The limitation of damages provision in the contract states that the amount that Conomos is rightfully due for work completed prior to the ending of the contract cannot exceed the contract price of $112,350.00. OCIP General Terms and Conditions ¶ 6 (cancellation provision); OCIP Field Services Contract, art. 3. The trial court awarded damages for services rendered under the contract, which it characterized as "Contractual Claims," of $59,918.48. Trial Court Memorandum Order, 11/13/01, at 7. In addition, the record reflects that Sun had paid Conomos the sum of $32,010.00 prior to the start of litigation. Trial Court Memorandum Order and Non–Jury Verdict, 6/26/01, at 4, *citing,* Plaintiff's Exhibit "N." The limited liability clause in the contract provides that Conomos "shall be paid an amount which, **when added to all previously paid installments,** will equal the sum of all costs properly incurred." OCIP General Terms and Conditions ¶ 6 (cancellation provision) (emphasis added). Therefore, we add Sun's payment ($32,010.00) to the trial court's award of damages for contractual claims ($59,918.48) to obtain the sum that must not exceed the contract price. The total sum of previously paid amounts and damages awarded for contractual claims is $91,928.48. This amount does not violate the limitation of damages clause because it does not exceed the contract price of $112,350.00.

¶ 26 Finally, we consider the effect of the limitation of damages provision on the categories of damages awarded under the CSPA. Sun contends, albeit with little or no argument in its brief, that the trial court erred by permitting the **total** damages awarded—which included interest, penalties, and reasonable attorney's fees

---

7. Notwithstanding its right to cancel, Sun's abandonment of the contract was not without consequence. The cancellation provision states: "provided that Contractor [Conomos] is not in default of any of its obligations hereunder, Owner [Sun] agrees that Contractor shall be paid an amount which ... will equal the sum of all costs properly incurred by Contractor prior to the date of cancellation, plus any earned profit on such incurred costs." OCIP General Terms and Conditions

¶ 6. Sun had reserved the right to end the relationship with Conomos for any reason, with the understanding that it would compensate it for any costs incurred as well as profit thereon, up to the price of the original contract. *Id.* Such a limitation of liability clause did not shield Sun from all responsibility for its actions. *See, Valhal Corp.,* 44 F.3d at 202–04. Rather, it prescribed the consequences for the ending of its contractual relationship.

and expenses under the CSPA on top of the $59,918.48 awarded for contractual claims—to exceed the ceiling set by the contract price. *See,* Appellant's Brief at 12 ("[T]he limitation of damages provisions ... limits [sic] ... certain common law damages and certain waiveable damages under the Contractor and Subcontractor Payment Act....").

¶ 27 The CSPA provides for three primary categories of damages for failure to make timely payments of amounts rightfully due. First, the Act provides for interest on impermissibly delayed payments. *See,* 73 P.S. §§ 505(d), 507(d). The CSPA states that a contractor's or subcontractor's performance in accordance with contractual provisions entitles it to payment from the other party as prescribed under their construction contract. 73 P.S. §§ 504, 505(a), 507(a), 507(c) (1994) (West Supp.2003). In the event that payment is untimely,[8] the Act provides that:

> Except as otherwise agreed by the parties, if any progress or final payment to a contractor is not paid within seven days of the due date established in subsection (c), the owner shall pay the contractor, beginning on the eight day, interest at the rate of 1% per month or fraction of a month on the balance that is at the time due and owing.

**8.** Timeliness depends on the parties' agreement on payment terms. 73 P.S. § 505(a). If no due date is agreed upon, the CSPA provides that: "Except as otherwise agreed by the parties, payment of interim and final invoices shall be due from the owner 20 days after the end of a billing period or 20 days after delivery of the invoice, whichever is later." *Id.* § 505(c).

**9.** It appears that, in the case of a contractor and subcontractor, as opposed to owner and contractor, the interest due on untimely payment may not be waiveable by the contracting parties. In the applicable subsection, the Act states that:

*Id.* § 505(d).[9] By beginning the provision with, "Except as otherwise agreed by the parties," this subsection provides that the parties may agree either to waive interest on untimely payments, or to accrue interest at a rate other than one percent. *Id.*

¶ 28 Second, in addition to interest, the CSPA provides for penalties. For failure to comply with the statute, the Act provides:

> If arbitration or litigation is commenced to recover payment due under this act and it is determined that an owner, contractor or subcontractor has failed to comply with the payment terms of this act, the arbitrator or court shall award, in addition to all other damages due, a penalty equal to 1% per month of the amount that was wrongfully withheld.

*Id.* § 512(a). Unlike the provision for interest, this subsection does not provide for the ability of parties to agree to no penalties. Further, the subsection provides that penalties will apply "in addition to all other damages due," distinguishing penalties from any other damages awarded either under the construction contract or under the CSPA.

¶ 29 Third, the Act provides for the awarding of reasonable attorneys' fees and expenses. The statute provides:

> If any progress or final payment to a subcontractor is delayed beyond the date established in subsection (b) or (c), the contractor or subcontractor shall pay the subcontractor interest, beginning on the next day, at the rate provided for in section [505(d)] on the balance that is at the time due and owing.

73 P.S. § 507(d). In contrast to section 505(d), section 507(d) does not begin with the statement, "except as otherwise agreed by the parties." It may be argued, nonetheless, that in the case of contractor and subcontractor interest may still be waiveable by contract as it is in the case of owner and contractor. However, that issue is not before us.

Notwithstanding any agreement to the contrary, the substantially prevailing party in any proceeding to recover any payment under this act shall be awarded a reasonable attorney fee in an amount to be determined by the court or arbitrator, together with expenses.

*Id.* § 512(b). Unlike the provisions for interest and penalties, this subsection expressly provides that even in the event that the parties agree otherwise, attorneys' fees and expenses are not waiveable.

■ ¶ 30 The trial court found that it had no discretion in awarding Conomos penalties, attorneys' fees and interest. Trial Court Memorandum Order, 11/13/01, at 5–6 ("[T]he use of the word 'shall' by the Legislature divests me of any discretion in making this award."). The trial court was correct in stating that the Act requires penalties and reasonable attorneys' fees for untimely payment of amounts improperly withheld. Here, the trial court was also correct in stating that the Act requires interest to be awarded, as the court found that the parties had not "otherwise agreed." *See,* 73 P.S. § 505(d). The trial court accordingly awarded Conomos $88,533.32 as prejudgment penalties and interest (calculated as a percentage of contractual damages), plus $25,452.97 as reasonable counsel fees and expenses, for a total of $173,904.77.[10] Trial Court Memorandum Order, 11/13/01, at 7; Trial Court Order, 6/11/02.

■ ¶ 31 The CSPA does not permit the penalty for failure to pay amounts "wrongfully withheld," or the award of reasonable attorneys' fees and expenses to the "substantially prevailing party in any proceeding to recover any payment under this act," to be waived by the parties. *See,* 73 P.S. § 512. Because the parties may not have agreed to waive such damages, the limitation of damages clause in the contract does not constrain the trial court's award of penalties or reasonable attorneys' fees and expenses beyond the amounts calculated as contractual claims.

■ ¶ 32 Interest, on the other hand, is waiveable between an owner and contractor. However, the limitation of damages clause in Sun's contract with Conomos does not appear to waive interest awards under the CSPA. The clause in the contract states that "all **costs properly incurred by Contractor prior to the date of cancellation** [shall] in no event ... be greater than the Contract price." OCIP General Terms and Conditions ¶ 6 (cancellation provision) (emphasis added). The clause does not state that any remedies calculated as a function of the costs for work completed are capped by the contract price. The interest awarded is a function of Sun's improper delay in payment, which is related to Sun's attentiveness in paying amounts properly due Conomos; the interest is not a function of Conomos's costs for services rendered under the contract. As the damages limited to the contract price by the limitation of liability clause are those for costs properly incurred by Conomos prior to cancellation, the contract does not establish that the parties intended to waive the interest due on late payments. Consequently, the trial court's interest award stands.

---

10. The CSPA specifies that penalties as well as interest are to accrue at the rate of one percent per month from the date on which payment was due. 73 P.S. §§ 505(d), 507(a). The trial court calculated its penalties and interest rates "by converting 1% per month to 12% per annum, then dividing by 365." Trial Court Memorandum Order, 11/13/01, at 6. The trial court also ordered that the daily interest and penalty rate of $39.39 is to continue to accrue from June 12, 2002, the date of the order, "until the matter is resolved." Trial Court Order, 6/11/02.

■ ¶ 33 While the trial court abused its discretion in refusing to enforce the express terms of the contract and imposing the obligation upon Sun to continue its relationship with Conomos, the trial court's error was harmless because its remedies did not violate the limited liability provision in the contract. The amount limited to the contract price was the sum of the trial court's damages for contractual claims and Sun's payments to Conomos prior to litigation ($59,918.48 plus $32,010.00, respectively). That sum, $91,928.48, did not exceed the contract price of $112,350.00. The limitation of damages clause did not bar, on the other hand, total damages awarded from including remedies under the CSPA on top of the contractual damages capped by the contract price. Consequently, damages are affirmed.

¶ 34 Sun's second issue on appeal is that the trial court erred in denying Sun's Motion for Judicial Admission that the contract between it and Conomos was in fact "terminated" rather than "cancelled." Sun contends that because the two terms have specific meanings and ascribe different rights under the contract, Conomos's use of the word "termination" in certain pleadings to describe the ending of the contract amounted to an admission that the contract was in fact terminated.

¶ 35 The necessary factual background to this claim is as follows. Under the contract,

> If Contractor [Conomos] is adjudged bankrupt, becomes insolvent, [and so forth,] or if Contractor violates any provision of this Contract, then Owner [Sun], without prejudice to any other rights or remedies expressly provided

herein, may terminate this Contract, or any part hereof, by notifying Contractor and shall have the right to take possession of all its property . . . and . . . of the Work completed under this Contract.

OCIP General Terms and Conditions ¶ 6 (termination provision). Conomos's original complaint stated that: "After further delay and its failure or refusal to respond in any manner to Plaintiff's [Conomos's] request to discuss the same, Defendant [Sun] abruptly **terminated** Plaintiff's contract." [11] Complaint in Civil Action, County of Allegheny, No. GD–98–006717, 4/20/98, ¶ 10 (emphasis added).

■ ¶ 36 Statements of fact by one party in pleadings, stipulations, testimony, and the like, made for that party's benefit, are termed judicial admissions and are binding on the party. *Nasim v. Shamrock Welding Supply Co.*, 387 Pa.Super. 225, 563 A.2d 1266, 1267 (1989) ("It is well established that a judicial admission is an express waiver made in court or preparatory to trial by a party or his attorney, conceding for the purposes of trial, the truth of the admission."). Judicial admissions are deemed true and cannot be contradicted by the admitting party. *Rizzo v. Haines*, 520 Pa. 484, 555 A.2d 58, 69 (1989); *Wills v. Kane*, 2 Grant 60, 63 (Pa. 1853) ("When a man alleges a fact in a court of justice, for his advantage, he shall not be allowed to contradict it afterwards. It is against good morals to permit such double dealing in the administration of justice."). If there is some support in the record for the truth of an averment, the trial court abuses its discretion if it disregards the admission. *Rizzo*, 555 A.2d at 69. Such averments are binding on a party

11. Appellee repeated almost identical language in an amended complaint. Amended Complaint in Civil Action, County of Allegheny, No. GD–98–006717, 1/24/00, ¶ 10 (alleging that "Defendant abruptly and in breach of its agreement terminated Plaintiff's contract.")

whether admitted by counsel or the client. *Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972). Such admissions are considered conclusive in the cause of action in which they are made—and any appeals thereof, *see, id.*—and the opposing party need not offer further evidence to prove the fact admitted. *Rizzo,* 555 A.2d at 69; *Nasim,* 563 A.2d at 1267.

■ ¶ 37 For an averment to qualify as a judicial admission, it must be a clear and unequivocal admission of fact. Judicial admissions are limited in scope to factual matters otherwise requiring evidentiary proof, and are exclusive of legal theories and conclusions of law. *Glick,* 458 F.2d at 1291. The fact must have been unequivocally admitted and not be merely one interpretation of the statement that is purported to be a judicial admission. *Jones v. Constantino,* 429 Pa.Super. 73, 631 A.2d 1289, 1293–94 (1993) (finding no admission where "the evidence could be reasonably construed to admit of more than one meaning"); *see also, Phila. Reinsurance Corp. v. Employers Ins. of Wausau,* 2003 WL 1698892, 2003 U.S.App. LEXIS 6198 (3d Cir.2003) ("An unequivocal statement is one that is clear, unambiguous and expresses only one meaning."); *Glick,* 458 F.2d at 1291; *The Doyle,* 105 F.2d 113, 117 (3d Cir.1939) (holding that "admissions to be binding must be unequivocal, . . . and anyway they may be disregarded in the interests of justice"). An admission is not conclusively binding when the statement is indeterminate, inconsistent, or ambiguous. *Greater Valley Terminal Corp. v. Goodman,* 405 Pa. 605, 176 A.2d 408, 410 (1962); *Dible v. Vagley,*

417 Pa.Super. 302, 612 A.2d 493, 499 (1992) (finding no admission in a statement in which "pronouns are burdened with ambiguous antecedents, and syntax is opaque" and that "to be an admission, a statement must at least be intelligible [and its] subject matter . . . readily determinable"); *AstraZeneca AB v. Mutual Pharm. Co.,* 250 F.Supp.2d 506, 518 (E.D.Pa.2003). When there is uncertainty surrounding a conceded fact, it is the role of the judge or jury as fact finder to determine which facts have been adequately proved and which must be rejected. *See, Oscanyan v. Arms Co.,* 103 U.S. 261, 263–64, 26 L.Ed. 539 (1880).[12]

■ ¶ 38 The statement by Conomos in the present case did not qualify as a judicial admission because it was not clear and unequivocal. The use of the word termination is reasonably susceptible to at least two different interpretations. First, as Sun argues, Conomos intended to distinguish contract termination from contract cancellation as those terms are defined in the contract. Second, Conomos intended to indicate simply that Sun ended the contract through its actions, divorced from any specific meanings assigned by the contract. Only a single word, "termination," found "in two separate, verified pleadings," Appellant's Brief at 19, forms the basis of what Sun describes as a clear averment that the ending of the contract was admittedly a termination rather than a cancellation. Sun offers no other statements or actions as support for the proposition that Conomos itself accepted the label "termination" rather than "cancellation" as the

---

12. As the U.S. Supreme Court explained:
    The power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced. The question in either case must be whether the facts upon which it is called to instruct the jury be clearly

established. If a doubt exists as to the statement of counsel, the court will withhold its directions, as where the evidence is conflicting, and leave the matter to the determination of the jury.
*Oscanyan,* 103 U.S. at 263.

mode by which the contract was ended.[13] When placed in context,[14] the term is susceptible to an interpretation other than what Sun argues. As judicial admissions cannot result from equivocal statements open to interpretation, Conomos's use of the word "termination" does not rise to the level of a judicial admission.

¶ 39 Conomos's statement further could not qualify as a judicial admission because it was not an admission of fact but rather would amount to a legal theory or conclusion of law. As defined in the contract, only Sun may terminate the contract, and only when particular conditions precedent are satisfied. *See,* OCIP General Terms and Conditions ¶ 6 (termination provision). Even had Sun properly intended to use any of those conditions as the violation upon which to base its termination, whether those conditions were present and whether Sun had indeed "terminated" the contract requires an interpretation and evaluation of the definitions in the contract and their legal implications. For Conomos to have averred that the contract indeed was terminated would have amounted to a legal conclusion, not a fact to be considered in reaching that legal conclusion. As termination and cancellation have specific legal meanings under the contract, the proposition that Sun indeed terminated the contract is a legal theory that Sun wished to advance, not a judicial admission of fact by Conomos.

¶ 40 Thus, we hold that the trial court did not err in denying Sun's motion for judicial admission.

¶ 41 We hold that a breach characterizable as a bad faith breach does not invalidate an entire contract where the parties had agreed in writing that one party (the eventual breacher) could cancel the contract at its option regardless of whether the other party had breached its obligations, where that one party did cancel, and where the limitation of damages clause applied to cancellations. On the other hand, a factor like fraud or unconscionability may justify ignoring the parties' agreement on a term. While the trial court should have enforced the limitation of liability clause in the contract, the error was harmless, as the damages awarded did not violate the clause. Accordingly, we affirm.

¶ 42 Judgment affirmed.

---

13. The record reflects that in a letter from Conomos's counsel to Sun, 4/15/97, Mr. Hirschfield referred to the ending of the contract in two places, once as a cancellation and once as a termination. This sort of inconsistency weakens Sun's assertion that Conomos was intentionally acknowledging that the contract was terminated rather than cancelled, as those terms are defined in the contract.

14. Justice Musmanno's description related to the interpretation of statutes is instructive here: a legal document "cannot be dissected into individual words, each one being thrown onto the anvil of dialectics to be hammered into a meaning which has no association with the words from which it has violently been separated." *Bertera's Hopewell Foodland, Inc. v. Masters,* 428 Pa. 20, 236 A.2d 197, 204 (1967).