J-A23025-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FREEDOM BEY | : | |
| | : | |
| Appellant | : | No. 1405 WDA 2018 |

Appeal from the Order Dated September 10, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0010884-2008

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FREEDOM BEY | : | |
| | : | |
| Appellant | : | No. 1406 WDA 2018 |

Appeal from the Order Entered September 26, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0010884-2008

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                FILED JANUARY 24, 2020

At 1405 WDA 2018, Appellant, Freedom Bey, filed an interlocutory appeal from the trial court's order denying his motion seeking to bar retrial on double jeopardy grounds.  At 1406 WDA 2018, Appellant filed an interlocutory appeal from the trial court's order denying his motion for in forma pauperis (IFP) status in the same case.  After careful review, we affirm the order at

1405 WDA 2018, vacate the order at 1406 WDA 2018, and remand for further proceedings.

This Court summarized the facts adduced at Appellant's first trial during his direct appeal as follows:

> On June 28, 2008, between 3:00 a.m. and 4:00 a.m., [Appellant], Randall Bentley, Jordan Doctor and Brenda Escedy were out to eat at Eat'n Park at the Waterfront shopping complex in Homestead, Pennsylvania. See N.T. Jury Trial, 7/13-14/10, at 35, 47-46, 177. Brendan Brooks, the victim, and Daniel Wallar entered the restaurant and sat down. See id.[] at 67. [Appellant] was slamming his plate and fork down, "like normal intoxicated people would be." Id.[] at 49.
>
> [Appellant] got up from his table, walked out of the restaurant, went to the window where Brooks and Wallar were seated, and started banging his hands on his chest and called Brooks out of the restaurant. See id.[] at 49-50. Kristi Lynn Emery was waiting on Brooks and Wallar and testified that Brooks remained calm. See id.[] at 51. Angela Casale, the manager of Eat'n Park, testified that she saw Brooks start walking toward the door. See id.[] at 89. Casale attempted to dissuade Brooks from leaving because she did not want there to be a fight. See id. She said that [Appellant] was irate, jumping up and down, screaming at the top of his lungs. See id.[] at 90. Unfortunately, Brooks did not heed Casale's advice and left the restaurant. Once Brooks was outside on the sidewalk, Emery and Casale observed [Appellant] "pull his right hand out, extend his arm and shoot [Brooks] three times." Id.[] at 54.
>
> Following a jury trial, which began on July 13, 2010, the jury convicted [Appellant] of [first-degree murder and carrying a firearm without a license]. On September 29, 2010, the trial court sentenced [Appellant] to life imprisonment on the murder conviction and to a concurrent two (2) to four (4) year term of incarceration on the firearms conviction.

Commonwealth v. Bey, No. 1693 WDA 2010, unpublished memorandum at 1-2 (Pa. Super. filed July 12, 2013). Appellant subsequently filed an

unsuccessful direct appeal. See Commonwealth v. Bey, 70 A.3d 1268 (Pa. Super. 2013) (unpublished memorandum), appeal denied, 80 A.3d 774 (Pa. 2013).

Appellant then filed a timely, pro se PCRA[1] petition, his first, on December 3, 2014. Subsequently, appointed counsel filed an amended PCRA petition (hereinafter "PCRA Petition") on Appellant's behalf on January 20, 2017. In the PCRA Petition, Appellant sought dismissal of the charges or a new trial based on, inter alia, various allegations of prosecutorial misconduct and after-discovered evidence. On October 11, 2017, the PCRA court granted the petition, vacating Appellant's sentence and awarding him a new trial based on the after-discovered evidence, noting it had done so because of the Commonwealth's "acquiescence based upon" that evidence. Order, 10/11/17, at 1 (single page). In the order, the PCRA court judge, the Honorable Joseph K. Williams, also indicated that he would not preside over the new trial due to his transfer to another division. Id. The trial court reassigned Appellant's case to the Honorable Jill E. Rangos, who then presided over Appellant's double-jeopardy hearing. Appellant's motion seeking IFP status was separately decided by the Honorable David R. Cashman.

On January 16, 2018, Appellant filed an omnibus pre-trial motion seeking, inter alia, to bar his retrial on double jeopardy grounds. The trial court held a hearing to address the motion on August 23, 2018, which

_____

[1] Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546.

continued on September 4, 2018. At the conclusion of the hearing, the court denied Appellant's motion, but also determined that it was not frivolous. See N.T., 9/4/18, at 38. On September 10, 2018, the court issued its findings of fact and conclusions of law. See Findings of Fact and Conclusions of Law (hereinafter "Opinion"), 9/10/18. On September 24, 2018, Appellant filed a motion seeking IFP status. On September 26, 2018, Judge Cashman denied the motion.

Appellant filed notices of appeal from each order on October 2, 2018, which were later consolidated sua sponte by this Court. See Order, 11/14/18, at 1 (single page).[2] He also filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on October 24, 2018. Judge Rangos issued a statement pursuant to Rule 1925(a) indicating that the trial court would rely on its September 10, 2018 findings of fact and conclusions of law. Judge Cashman separately issued a Rule 1925(a) opinion addressing the IFP issue on March 15, 2019.

In Appellant's brief, his statement of the questions presented does not directly correspond to the issues he subsequently presents in the argument section. Consequently, we will address only the issues presented in the argument section of Appellant's brief that are also clearly raised in his statement of the questions presented. Any issues omitted from either section of Appellant's brief are waived. See Graziani v. Randolph, 856 A.2d 1212,

_____

[2] At 1405 WDA 2018, Appellant challenged the trial court's denial of his motion to dismiss on double jeopardy grounds. At 1406 WDA 2018, Appellant challenged the trial court's order denying him IFP status.

1216 (Pa. Super. 2004) (finding waived all claims raised in the argument section of the appellant's brief that were not raised in the 'questions presented' section); see also Pa.R.A.P. 2116 ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). In the argument section of Appellant's brief, he presents the following claims for our review, which we have rewritten for clarity and ease of disposition:

I. Did the trial court err when it determined that Appellant's retrial is not precluded on double-jeopardy grounds due to numerous instances of prosecutorial misconduct?

II. Was the Commonwealth precluded from proceeding on the charge of first[-]degree murder under the doctrine of judicial admissions?

III. Did the trial court abuse its discretion when it reopened the record to permit the Commonwealth to present an additional witness at the double-jeopardy hearing?

IV. Did Appellant follow the proper procedure when he filed his double-jeopardy motion at the pretrial stages of the second trial, rather than by appealing the PCRA court's decision to grant a new trial?

V. Did the trial court err when it denied Appellant's motion for IFP status?

VI. Did the trial court err when it quashed Appellant's subpoena seeking information from the Pittsburgh Police regarding the Sin City Disciples?

VII. Did the trial court err when it refused to pay for an expert witness on criminal gangs?

See Appellant's Brief at 15, 80, 84, 92, 94, 105, 114.

I.

Appellant's first claim concerns the trial court's determination that double jeopardy did not bar his retrial. Appellant argues the prosecutor's ostensible misconduct was, individually or collectively, intentionally designed to deny him a fair trial. The prosecutor at Appellant's trial was Assistant District Attorney Lisa Pellegrini of the Allegheny County District Attorney's Office.

We begin by determining, as argued by the Commonwealth, if Appellant waived this double-jeopardy claim by failing to appeal the PCRA court's order granting a new trial. The Commonwealth argues that the trial court (Judge Rangos) was compelled by the coordinate jurisdiction rule to honor the decisions of the PCRA court (Judge Williams). The Commonwealth contends that the PCRA court effectively denied Appellant's double-jeopardy claim in the order granting Appellant a new trial.

Our Supreme Court has described the coordinate jurisdiction rule as follows:

> One of the distinct rules that are encompassed within the "law of the case" doctrine[6] is the coordinate jurisdiction rule. Generally, the coordinate jurisdiction rule commands that upon transfer of a matter between trial judges of coordinate jurisdiction, a transferee trial judge may not alter resolution of a legal question previously decided by a transferor trial judge. … Starr, … 664 A.2d [at] 1331 …; see also Riccio v. American Republic Insurance Co., … 705 A.2d 422, 425 ([Pa.] 1997). More simply stated, judges of coordinate jurisdiction should not overrule each other's decisions. Id.; Okkerse v. Howe, … 556 A.2d 827, 831 ([Pa.] 1989).
>
> > [6] Among rules that comprise the law of the case doctrine are that: "(1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a

- 6 -

> second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court." Commonwealth v. Starr, ... 664 A.2d 1326, 1331 ([Pa.] 1995).
>
> The reason for this respect for an equal tribunal's decision, as explained by our [C]ourt, is that the coordinate jurisdiction rule is "based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency." Starr, 664 A.2d at 1331. Furthermore, consistent with the law of the case doctrine, the coordinate jurisdiction rule serves to protect the expectations of the parties, to insure uniformity of decisions, to maintain consistency in proceedings, to effectuate the administration of justice, and to bring finality to the litigation. Id.
>
> This general prohibition against revisiting the prior holding of a judge of coordinate jurisdiction, however, is not absolute. Departure from the rule is allowed in "exceptional circumstances" when there has been a change in the controlling law or where there was a substantial change in the facts or evidence.

Zane v. Friends Hosp., 836 A.2d 25, 29 (Pa. 2003).

> Here, the Commonwealth argues that Appellant
>
> has waived his double-jeopardy claim by not challenging Judge Williams' order granting him a new trial. In his PCRA petition, [Appellant] requested relief in the form of discharge from the case or, in the alternative, a new trial.... While [Appellant] had not expressly couched his claim for relief in terms of double jeopardy, Judge Rangos believed that [Appellant]'s request for the dismissal of the charges against him based on the actions of ADA Pellegrini was essentially a double-jeopardy motion by another name and one that had already been decided-and denied-by Judge Williams.... As a result, Judge Rangos determined that the law of the case doctrine and the rule of coordinate jurisdiction, see ... Starr, 664 A.2d [at] 1331 ..., actually precluded her from ruling on the merits of [Appellant]'s double-jeopardy motion, as she was bound by Judge Williams' prior determination.... Nevertheless, out of an abundance of caution, Judge Rangos decided to hold a hearing on [Appellant]'s motion and make a ruling on its merits.

Commonwealth's Brief at 16 n.8 (some citations omitted). Indeed, Judge Rangos initially held that Appellant was barred from relitigating whether double jeopardy principles barred his retrial, before she proceeded to entertain Appellant's double-jeopardy motion out of an abundance of caution. See N.T., 8/15/18, at 9-11. The trial court reached its initial conclusion by distinguishing Commonwealth v. Minnis, 83 A.3d 1047 (Pa. Super. 2014) (en banc), from the facts and procedural posture of this case. Id. at 9. After careful consideration, we disagree with the trial court that this matter is distinguishable from Minnis.

In Minnis, the defendant filed a PCRA petition requesting either dismissal of the charges or a new trial based on prosecutorial misconduct. Minnis, 83 A.3d at 1049. The PCRA court did not hold a hearing on the issue, but granted relief in the form of a new trial. Id. at 1049-50. Minnis then filed a pre-trial motion seeking to bar his retrial on double-jeopardy grounds. The "trial court concluded that Minnis waived his constitutional double[-]jeopardy claim because he requested and received a new trial" during the PCRA proceedings. Id. at 1050.

The Minnis Court reversed the lower court's decision, thereby overruling Commonwealth v. Constant, 925 A.2d 810 (Pa. Super. 2007) (holding that seeking relief in the form of a new trial waives a claim that retrial is barred by double jeopardy). The Minnis Court reasoned as follows:

> [W]e are compelled to conclude that the Constant Court erred in holding that a defendant who moves for a new trial necessarily waives any argument that double jeopardy bars a second trial.

> We cannot reconcile that outcome with the development of the applicable law, as expressed in Martorano,[3] nor can we reconcile it with our Supreme Court's pronouncement in Potter[4] that the availability of double jeopardy protection does not depend on "nice procedural distinctions." Potter, … 386 A.2d at 921. We hereby overrule Constant.
>
> The nature and extent of the alleged prosecutorial misconduct in this case remains to be determined. The trial court permitted discovery on the matter, but ultimately declined to conduct a hearing based on this Court's opinion in Constant. Since Constant no longer represents binding authority, we will remand to the trial court for further proceedings consistent with this opinion.

Minnis, 83 A.3d at 1053.

Here, as was the case in Minnis, Appellant argued in his PCRA petition for dismissal of his charges and, in the alternative, a new trial. Judge Williams did not conduct an evidentiary hearing. Moreover, when Judge Williams granted Appellant a new trial, he did not expressly deny Appellant's request for dismissal of the charges, although, implicitly, his ruling essentially had that effect. The trial court contends that the instant case is distinguishable because "all discovery occurred before J[udge] Williams granted a new trial[,]" whereas additional evidence of prosecutorial misconduct was uncovered after Minnis was granted his new trial. However, there is nothing in Minnis that

_____

[3] Commonwealth v. Martorano, 741 A.2d 1221, 1223 (Pa. 1999) (holding that "a fair trial is not simply a lofty goal, it is a constitutional mandate, and where that constitutional mandate is ignored and subverted by the Commonwealth, we cannot simply turn a blind eye and give the Commonwealth another opportunity") (cleaned up).

[4] Commonwealth v. Potter, 386 A.2d 918 (Pa. 1978).

suggests that such a distinction is dispositive of whether a double-jeopardy motion is precluded at a new trial.[5]  Furthermore, both the Minnis and Potter decisions clearly disapprove of the strict application of waiver principles to double-jeopardy claims following the granting of a new trial on prosecutorial misconduct grounds.  Accordingly, we conclude that the trial court erred when it determined that it was precluded from ruling on Appellant's double-jeopardy claim due to Judge Williams' decision to grant a new trial to Appellant under the PCRA.

Thus, we now turn to the merits of Appellant's double-jeopardy claim. "An appeal grounded in double jeopardy raises a question of constitutional law.  This court's scope of review in making a determination on a question of law is, as always, plenary."  Commonwealth v. Mattis, 686 A.2d 408, 410 (Pa. Super. 1996).

> Under both the federal and state constitutions, double jeopardy bars retrial where the prosecutor's misconduct was intended to provoke the defendant into moving for a mistrial.  See Oregon v. Kennedy, 456 U.S. 667 … (1982); Commonwealth v. Simons, … 522 A.2d 537 ([Pa.] 1987).  In Commonwealth v. Smith, … 615 A.2d 321 ([Pa.] 1992), our Supreme Court recognized that the standard set forth in Oregon v. Kennedy, supra, was inadequate to protect a defendant's rights under the Pennsylvania Constitution.  The Court stated:
>
>> We now hold that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant

---

[5] We leave for another day whether a double-jeopardy claim is precluded when the issue was fully litigated during the PCRA process, i.e., where the PCRA court holds an evidentiary hearing on the issue and explicitly denies the request for dismissal of charges based on that hearing.  Here, there was no PCRA hearing, and no explicit denial of the requested relief.

> not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.
>
> Smith, … 615 A.2d at 325 (quoted in … Martorano, … 741 A.2d [at] 1223…).
>
> Prosecutorial misconduct includes actions intentionally designed to provoke the defendant into moving for a mistrial or conduct by the prosecution intentionally undertaken to prejudice the defendant to the point where he has been denied a fair trial. Smith, … 615 A.2d at 325. The double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant subjected to the kind of prosecutorial misconduct intended to subvert a defendant's constitutional rights. Id. … at 325. However, Smith did not create a per se bar to retrial in all cases of intentional prosecutorial overreaching. See Commonwealth v. Simone, 712 A.2d 770 (Pa. Super. 1998)…. "Rather, the Smith Court primarily was concerned with prosecution tactics, which actually were designed to demean or subvert the truth seeking process." Id. at 774-75. The Smith standard precludes retrial where the prosecutor's conduct evidences intent to so prejudice the defendant as to deny him a fair trial. A fair trial, of course is not a perfect trial. Errors can and do occur. That is why our judicial system provides for appellate review to rectify such errors. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied.

Commonwealth v. Chmiel, 777 A.2d 459, 463–64 (Pa. Super. 2001).

Here, Appellant contends that the prosecutor's misconduct was of such a nature that it was designed to intentionally deprive him of a fair trial, thus barring his retrial under the Pennsylvania Constitution.[6] He raises numerous

_____

[6] Because the Pennsylvania Constitution provides greater double-jeopardy protection than its federal counterpart and, in fact, subsumes and then adds to the federal standard, we need not consider the federal standard separately. In any event, Appellant does not argue that the prosecutor's actions were designed to provoke him into moving for a mistrial.

sub-issues in his argument but, notably, none of the sub-issues were specifically raised in Appellant's Rule 1925(b) Statement, nor in his statement of the questions presented. It is now axiomatic that "[a]ny issues not raised in a 1925(b) statement will be deemed waived." Commonwealth v. Lord, 719 A.2d 306, 309 (Pa. 1998). While the "Statement should not be redundant or provide lengthy explanations as to any error[,]" Pa.R.A.P. 1925(b)(4)(iv), and "[e]ach error identified in the Statement will be deemed to include every subsidiary issue that was raised in the trial court[,]" Pa.R.A.P. 1925(b)(4)(v), the Statement must, nonetheless, "concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge[,]" Pa.R.A.P. 1925(b)(4)(ii). Here, Appellant did not specifically identify what (mis)conduct formed the basis for his double jeopardy claim in his Rule 1925(b) statement. Out of an abundance of caution, we will consider the specific claims of misconduct alleged by Appellant only insofar as they were addressed to some extent by the trial court in its opinion, but we otherwise deem waived any issue not considered at all in that opinion due to Appellant's lack of specificity in his Rule 1925(b) statement.[7]

First, Appellant argues that "repeated references, both in [the prosecutor's] questioning [of Appellant] and in her closing, were made to

_____

[7] We further note that, following the filing of the trial court's Rule 1925(a) statement, Appellant did not file any request for the trial court to file a supplemental opinion to address any sub-issues he believes should have been considered by the trial court in reference to the denial of his motion to bar retrial on double jeopardy grounds.

[Appellant's] selling [m]arijuana, despite [Appellant's] not being charged with any drug related crimes." Appellant's Brief at 26; see also N.T. Trial, 7/13/10-7/16/10, at 501-03, 515, 529, 589 (closing argument). Appellant cites Commonwealth v. Collins, 341 A.2d 492 (Pa. 1975), for the proposition that it "is improper for a prosecutor to attack a defendant on the basis of involvement with illegal drugs when such is a tangential issue in the case." Appellant's Brief at 23.

The Commonwealth argues that the prosecutor's references to Appellant's admitted drug dealing were proper and, even if improper, would still not warrant the extreme remedy of barring his retrial. Additionally, the trial court determined that

> the Prosecutor's comments about [Appellant's] being a drug dealer were based on [his] own testimony and were a fair response to … Defense counsel's closing argument. [Appellant] made his drug dealing a relevant issue, rather than a tangential issue in the case, by arguing that the victim's knowledge of his drug dealing was the motive for prior attacks by the victim on [Appellant]. Those past acts of violence against [Appellant] by the victim formed the basis of his self-defense argument.

Opinion at ¶ 18 (unnumbered pages, citation omitted).

We agree with the Commonwealth and the trial court. A "defendant may open the door and voluntarily step beyond the protection of … the general rule prohibiting the introduction of evidence concerning his prior and other crimes." Commonwealth v. Flagg, 242 A.2d 921, 922 (Pa. Super. 1968). Here, Appellant opened the door to discussions of his drug dealing, as it was incorporated into the narrative of his self-defense claim.

From the outset of the case, Appellant presented a claim of self-defense. See N.T. Trial at 31 (Appellant's trial attorney's stating during his opening statement that the prosecutor "has to prove beyond a reasonable doubt that it was not in self-defense"). Appellant then provided, without any provocation, the first reference to marijuana use during his direct-examination. Id. at 458 (Appellant's indicating that he would "normally" pay the victim to look the other way when his friends were smoking marijuana in the club where victim worked as a bouncer). Later, during the direct-examination of Appellant, he indicated that he smoked marijuana as well, again without any prompting by his counsel. Id. at 467.

The first reference to Appellant's selling drugs occurred during his cross-examination:

> Q. So why would he kidnap you?
>
> MR. THOMASSEY:[8] Objection. How would he know the answer to that, Judge?
>
> THE COURT: Overruled, overruled, overruled.
>
> Keep going.
>
> BY MS. PELLEGRIN[I]:
>
> Q. Why you?
>
> A. He wanted some money.
>
> Q. Well, what did you do for a living back then?

_____

[8] Mr. Thomassey served as defense counsel during Appellant's first trial.

- 14 -

A. Like I told you, at the time I had worked -- I was working construction but, you know, I had a lot of money. I am not going to proclaim to be an angel.

Q. Well, how did you make that money, sir?

A. First I was known for having money. My grandmother passed. She left me a nice sum of money, but I also sold marijuana. I would sell high-grade marijuana.

Id. at 501.

The prosecutor then proceeded to ask several questions regarding Appellant's admission about dealing marijuana, and yet defense counsel did not object to any of these questions. Id. at 501-04. Appellant then proffered his theory that the victim intended to kidnap him to obtain the proceeds of his drug dealing. Id. at 503 ("Drug dealers, drug dealers' associates, drug dealers' children, their wives, their girlfriends. They were kidnapping anybody that they thought they could extort money out of."). During this line of questioning, an issue concerning Appellant's prior offense for illegal possession of a gun arose, and was debated at sidebar. Id. at 504-08. Yet, Appellant's attorney did not make any objection or comments concerning Appellant's admitting that he sold marijuana or to the prosecutor's questions in that regard. Later, the prosecutor again referenced Appellant's marijuana dealing when quoting his statement to police. Id. at 523. And, again, Appellant's attorney did not object. Id. Appellant provided the next mention of his marijuana dealing, which was not prompted by the prosecutor's question, but was repeated by the prosecutor after he mentioned it:

Q. Then you happen to run into your good friend Ramon Bentley?

A. That would be correct.

Q. Okay. And he's begging you to hang out with him. Right?

A. Yeah, you could say that.

Q. Because he wants you to help him get out of the street life. Right?

A. Not so much he wants me to help him get out of the street life. Not that he wanted me to help him get out of the street life. Ramon Bentley knew I wasn't one to be around -- to try to be around trouble because I'm not a troublesome person, plus Ramon Bentley wanted to sell marijuana for me.

Q. So on June 28th of 2008, you were still selling marijuana? I'm just trying to understand what you just said, sir. Correct.

Id. at 528.

From this record, it is clear that Appellant, not the prosecutor, initially exposed his marijuana dealing to the jury. Furthermore, at no point did Appellant's attorney object during the numerous follow up questions concerning that fact. Moreover, it was clear that Appellant believed, and attempted to convey to the jury his belief, that the victim had repeatedly targeted him, and eventually plotted to kidnap him and/or his son in order to extort money because Appellant was known to be a marijuana dealer who carried a lot of cash on his person.

Indeed, this was precisely the argument made to the jury during defense counsel's closing statement:

Freedom's out there. He's a street kid – you heard him -- selling marijuana. Big deal. So what. Ten years from now it probably will be legal. You didn't hear anything about cocaine. You didn't hear anything about heroin. So he works and makes a couple bucks selling a little weed. Who cares.

> Big Bub knew that he had money and routinely put the arm on him. That's what this case is all about....

Id. at 584 (emphasis added).

Subsequently, in response to this line of argument, the prosecutor made a few references to Appellant's dealing marijuana in her closing statement. Id. at 589-590. Again, the defense did not object. Moreover, the prosecutor's references to Appellant's drug dealing were not a core aspect of the prosecutor's argument, which continued on for an additional 13 pages of the transcript. See id. at 590-603. At no point did the prosecutor directly or indirectly infer Appellant's guilt for murder because he dealt drugs.

As Appellant never objected to the prosecutor's mentioning of his marijuana dealing, this aspect of Appellant's double-jeopardy claim is waived.[9] In any event, alternatively, we would agree with the trial court and the Commonwealth that no prosecutorial misconduct occurred with respect to this information, as the proverbial door was opened by Appellant, and/or the

_____

[9] Appellant argues that he was not required to object at trial to prosecutorial misconduct for it to be considered as part of his double-jeopardy claim, citing Martorano for the proposition that such claims turn exclusively on "the nature and egregiousness of the prosecutorial misconduct[,]" not whether challenges to the alleged misconduct were preserved with an objection. Appellant's Reply Brief at 18. However, Appellant cites to no authorities interpreting Martorano in such a broad, far-reaching fashion, and the decision itself is silent on waiver. Moreover, such an interpretation runs contrary to all of our preservation/waiver rules, and ignores the possibility that, in some circumstances, there is a strategic basis for the failure to object. Accordingly, we reject Appellant's assertion that waiver principles are completely abandoned for double-jeopardy claims seeking to bar retrial. Furthermore, this is not a case where the prosecutorial misconduct at issue had only been discovered after the fact, in which case it would be unreasonable to expect a contemporaneous objection.

remarks constituted fair response to Appellant's self-defense theory and related statements by counsel. In Collins, by contrast, the Commonwealth admitted that the "that the conduct of the prosecutor during the trial was reprehensible and censurable." Collins, 341 A.2d at 492. Although Collins is similar to the instant case in that drug dealing was frequently mentioned by the prosecutor, and Collins admitted to dealing drugs on the stand, id. at 500, there is no indication in Collins that the defendant's drug dealing was part-and-parcel of his defense strategy; indeed, Collins had argued at his trial that he was not present at the time of the murder. Thus, had Appellant not waived this aspect of his claim, we would nonetheless hold that it does not support his argument that his retrial should be barred on double-jeopardy grounds.

Next, Appellant contends that the prosecutor engaged in misconduct by leaving an impression with the jury that he used his right to discovery to facilitate the presentation of false testimony. See Commonwealth v. Bricker, 487 A.2d 346, 353-54 (Pa. 1985) (holding that "remarks implying that the defense used its right of discovery to present false testimony" had violated "the rules … that a prosecutor must limit statements to facts in evidence and reasonable inferences therefrom and must not express personal opinions on guilt, credibility, or strategy"). Contrary to the Commonwealth's argument, this specific subclaim was, in fact, raised in Appellant's motion to bar retrial. See Appellant's Omnibus Pretrial Motion, 1/16/18, at 37-38. However, the trial court did not address this matter in its opinion, and Appellant did not specifically reference it in his Rule 1925(b) statement.

Accordingly, the claim has been waived.  See Lord, supra.  Nevertheless, if we were able to consider this matter, we would find that it does not rise to the level of misconduct that would bar Appellant's retrial.

After getting Appellant to admit that he had fully read the discovery material made available to him, see N.T. Trial at 511, 562, the prosecutor made the following remarks about him during her closing statement:

> See, this is all he's had, two years and fourteen days.  Remember he said that?  Two years and fourteen days with all the police reports.  Okay.  Contrary to what the defense wants you to believe, you know, I must turn over all the police reports, the photos and everything else.  He's had two years and fourteen days to fit every single fact into his version of events to make him look like the victim, to make Brendan Brooks the thug. Two years and fourteen days, and who do we have to say that Brendan Brooks terrorized him? His friends. Well, you can judge their credibility for yourself, and the defendant.   Nothing, nothing else.  He made it up.

Id. at 589-90.  The prosecutor ostensibly was referencing this theory later in her closing statement ("He's trying to con you with two years and fourteen days of preparation."), which prompted an objection by the defense.  Id. at 602.

In, Bricker, we held that a similar statement by the prosecutor constituted prosecutorial misconduct:

> And I remind you as Mr. Hilner pointed out to you, that defendants get complete discovery. They get the homicide file, they get the statements, they get to review it.
>
> Mr. Gabler had all that information available to him before he sat down and discussed the case with Bricker and with Prosdocimo. So you would expect his story to be perfect, because you can put it together from the information you get.

> And it is very difficult to shoot down a fabricated story. But if you use your common sense in this case, there will be no doubt in your mind that it is fabricated.

Bricker, 487 A.2d at 354 (quoting the prosecutor's closing statement).

Thus, we agree with Appellant that the prosecutor's statement regarding discovery was not permissible under the lead opinion in Bricker. However, as noted by the Commonwealth, Bricker was a plurality opinion and, as such, it is not entitled to precedential value. As the Commonwealth argues:

> In fact, in contrast to the position adopted by [Appellant], this Court, in Commonwealth v. Judy, 978 A.2d 1015, 1024 (Pa. Super. 2009), has stated that "[i]n cases where the outcome is controlled by credibility determinations, a prosecutor is permitted to make comments reinforcing the fact that the jury is presented with conflicting accounts." The Court continued: "A prosecutor[']s contention that a defendant lied is neither unfair nor prejudicial when the outcome of the case is controlled by credibility, the accounts of the victim and the defendant conflict, and defense counsel suggests that the victim is fabricating." Id. Here, there was no testifying victim because he was dead, but the Commonwealth presented two Eat'n Park employees who testified that [Appellant] shot Brooks and that Brooks had no weapon in his hands and made no motion toward his pocket or waistband[.] ([N.T. Trial at] 56, 93-94, 106). [Appellant] then took the stand and offered conflicting testimony. Under these circumstances, the Commonwealth submits that the rationale of Judy still applies and that it was certainly fair for ADA Pellegrini to suggest that while preparing for trial, [Appellant] had tailored his testimony to the police reports and other discovery that he had received.

Commonwealth's Brief at 35-36.

We agree with the Commonwealth that the Bricker plurality is not controlling precedent. Furthermore, we agree with the Commonwealth that, as per the rationale set forth in Judy, in cases that turn on the credibility of conflicting testimony, and where the defendant's testimony contradicts the

testimony produced by the Commonwealth, it is irrational to prohibit a prosecutor from assailing the credibility of the accused. As the Judy Court explained, the general rule is that "a prosecutor cannot intrude upon the exclusive function of the jury to evaluate the credibility of witnesses by broadly characterizing the testimony of a witness as a big lie." Judy, 978 A.2d at 1023 (quotation marks omitted). "Nonetheless, a prosecutor's assertion that a witness had lied does not warrant a new trial when the statement was a fair inference from irrefutable evidence rather than a broad characterization." Id. at 1023-24 (quotation marks omitted). Thus, while it may be generally improper for a prosecutor to suggest that a defendant's access to discovery was the basis for fabricating a defense, such a comment is permissible in limited circumstances.

Here, Appellant's version of events was simply incompatible with the other eyewitnesses' testimony regarding the shooting. In his version of events, the victim had drawn a knife on him, whereas the other witnesses testified that Appellant shot an unarmed man. It is undisputed, however, that police discovered a knife in the victim's pocket, and the defense exploited that fact to support its self-defense theory. Appellant's knowledge of the victim's possession of a knife could have come from two potential sources: 1) If Appellant was telling the truth, he observed the knife in victim's hand just prior to shooting him; however, 2) if Appellant was lying, he could have simply learned of the victim's knife through discovery, and then used that fact to buttress a fabricated version of events. Thus, in the specific circumstances of

this case, we determine that the prosecutor's comments constituted rational inferences from undisputed evidence, as well as fair response to the defense's theory that the victim had pulled a knife on him before the shooting occurred. In any event, even if we were to deem that the comments to that effect were impermissible, we would nevertheless conclude that they were only marginally impermissible and minimally prejudicial, and that the prosecutor did not clearly make them with the intent to deprive Appellant of a fair trial, as there was a reasonable argument that they were permissible.

Next, Appellant argues that the prosecutor knowingly allowed a witness, Daniel Wallar, to testify to statements he knew or should have known were false—specifically, Mr. Wallar's in-court identification of Appellant as the shooter. The trial court determined that there was no misconduct regarding that witness's testimony at all. Opinion at 12 ¶¶ 26-27.

Mr. Wallar was a friend of the victim, a fellow member of the Sin City Disciples, and was with the victim at the Eat'n Park. Mr. Wallar followed the victim out of the restaurant just prior to the shooting. N.T. Trial at 133. He observed the victim arguing with someone, but he did not hear what the argument was about. Id. at 134. He then observed "an individual firing a couple of shots." Id. at 137. The prosecutor then asked if he could identify the shooter. Id. As Mr. Wallar began responding that he could, the prosecutor immediately asked for a sidebar. Id. At that point, Judge Williams placed the following statement on the record:

> Let me frame this. Assistant District Attorney Pellegrini at this point in the proceedings has asked for a sidebar and informed Mr. Thomassey[, defense counsel,] and myself that prior to this moment she never knew that the witness, Mr. Wallar, could identify anyone as the shooter in this matter and buttresses that statement with it[ is] a complete surprise to her that he can say who the shooter was. When I listened to this testimony in the way that it's evolved, I think it was -- it didn't evolve naturally to me. I think if I were in this case, I would have just asked what happened, but the incremental steps in this serendipitous course to get to this point makes me uncomfortable to preclude the defense from using prior history about this person because I believe that he is really not a credible person and I don't know if the probative value of what he says far exceeds prejudicial value of the [c]ourt['s] knowing the breadth and the scope of who he is. I haven't ruled on this, but contingent upon what he says and how this evolves, I may revisit my ruling about the matters as to what can come in in terms of his history.

Id. at 137-38. Previously, the trial court had ruled that defense counsel's cross-examination of Mr. Wallar would be restricted due to the limited nature of his expected testimony. However, following the revelation that Mr. Wallar was going to identify Appellant as the shooter, defense counsel requested that Judge Williams revisit that ruling. Id. at 138-39.

In the ensuing discussion between the parties and the trial court, Judge Williams expressed both that it was "blatantly and patently unfair in the midst of a trial" to have a Commonwealth witness surprise the defense with a new identification, but also that he believed "the Commonwealth's position that they had no idea prior to this point that [Mr. Wallar was] going to identify the defendant...." Id. at 139. When the court stated that the prosecutor should have known that Mr. Wallar had seen the shooter given the other evidence,

including his position as observed on the security cameras, the prosecutor responded:

> Your Honor, with all due respect, the detective questioned Mr. Wallar repeatedly. I have met with Mr. Wallar for pretrial interviews. He said he could not identify anyone. I confronted him with the fact, "You're standing right there. What do you mean you can't identify him?" I'm not going to put words in his mouth. The guy said he can't identify someone. It happens all the time, whether you're scared, whether you don't want to be a snitch. I don't know what his reason is, but I can tell you right now with regard to how I'm putting [o]n this case, because of the actions you have, I have to go step by step so that the jury can understand.

Id. at 140.

Defense counsel immediately responded, "Maybe you misunderstood me, Ms. Pellegrini. I'm not alleging any prosecutorial misconduct here at all, Judge. I believe what you're telling me." Id. at 141 (emphasis added). The trial court agreed, stating, "I'm not blaming you for having done anything that's inappropriate." Id. The court then determined that it would permit the defense to use crimen falsi evidence to impeach Mr. Waller, which the court had previously precluded, due to Mr. Wallar's unanticipated testimony. Id.

Now, through new counsel, Appellant alleges that there "is nothing on the record to indicate that ADA Pellegrini spent one second contemplating whether Mr. Wall[a]r was in fact going to testify truthfully, or whether he was going to commit perjury. The only concern ADA Pellegrini had was whether or not Judge Williams was going to allow defense counsel to cross-examine Mr. Wall[a]r on his [prior crimen falsi offenses.]" Appellant's Brief at 41.

Appellant argues further that the prosecutor was overly concerned about whether a mistrial would be granted. Id.

However, the defense never requested a mistrial over this matter. Indeed, Appellant's trial counsel expressly stated that he was not alleging any prosecutorial misconduct at all during the discussion that followed Mr. Wallar's unexpected testimony. Furthermore, Appellant's concern about Mr. Wallar's truthfulness with regard to his sudden decision to identify him as the shooter appears overwrought, and his allegation of prosecutorial misconduct borders on absurdity. See id. at 47-48 ("ADA Pellegrini knowingly allowed false testimony by Mr. Wall[a]r, and made no attempt to correct the record about statements that she knew to be false...."). First, Appellant claimed that he shot the victim in self-defense. Thus, the unexpected testimony by Mr. Wallar—that he could identity Appellant as the shooter despite having claimed otherwise beforehand—did not even conflict with the defense's theory of the case. We are consequently confused regarding what part of Mr. Wallar's testimony that Appellant even contends was untruthful. Even if Mr. Wallar was lying when he said that he could identify the shooter, Appellant does not even dispute the underlying truth of the matter, i.e., that he shot the victim. Thus, we cannot ascertain how Appellant was prejudiced by that particular aspect of Mr. Wallar's testimony.

Moreover, contrary to Appellant's assertions, the record clearly indicates that the prosecutor was surprised by Mr. Wallar's sudden ability to identify Appellant. She immediately brought it to the court's attention in accordance

with her ethical responsibilities as an attorney and as a prosecutor. That the prosecutor was also concerned with the scope of cross-examination is not evidence of misconduct. Accordingly, for all the above reasons, we conclude that there was no prosecutorial misconduct at all involving Mr. Wallar's testimony, and that even if there was, Appellant was not prejudiced because the unexpected testimony—that Mr. Wallar observed Appellant shoot the victim—did not conflict with Appellant's own version of events.

Next, Appellant complains that ADA Pellegrini misled the defense and the court after Judge Williams granted Appellant a new trial. In her written response in opposition to Appellant's double-jeopardy motion, the prosecutor indicted that "neither the Commonwealth nor the Allegheny County Police Department ([ACPD]) possessed any knowledge of the additional Eat'n Park security videos." Commonwealth's Response to Appellant's Omnibus Pretrial Motion, 2/20/18, at 8. At the double-jeopardy hearing, Appellant's current counsel cross-examined the investigating officer from the ACPD, Detective Patrick Kinavey. Counsel asked the detective if he "watched all the videos in this case?" First Double-Jeopardy Hearing, 8/23/18, at 69. Detective Kinavey responded, "I did." Id. From this, Appellant asserts that "ADA Pellegrini is still making false and misleading statements to the trial court in an attempt to deprive [Appellant] of his rights." Appellant's Brief at 49. Appellant continues: "ADA Pellegrini's written statement that the Commonwealth, including the [ACPD], had no knowledge of the additional surveillance video,

was blatantly false, [and] contradicts the testimony of her own detective in this case...." Id.

This claim was not raised, for obvious reasons, in Appellant's double-jeopardy motion. While this was excusable, as Detective Kinavey had not yet testified in ostensible contradiction to ADA Pellegrini's statement, the matter was also not specifically raised in Appellant's Rule 1925(b) statement, nor was it addressed in the trial court's opinion. Accordingly, we agree with the Commonwealth that Appellant waived consideration of this aspect of his double-jeopardy claim. See Lord, supra.

In any event, we agree entirely with the Commonwealth's determination that this issue is "baseless." Commonwealth's Brief at 41. As the Commonwealth explains:

> In her written response, ADA Pellegrini stated that neither she nor the [ACPD] had any knowledge of any additional Eat'n Park security footage beyond the one of the vestibule of the restaurant that was played at trial (see [Commonwealth's Response to Appellant's Omnibus Pretrial Motion, 2/20/18, at 8.]). At the subsequent double-jeopardy hearing, Detective Kinavey of the ACP[D], ... testified that he had actually viewed other angles of surveillance-camera footage from Eat'n Park just after the murder but that he collected only the one that was ultimately used at trial ([Double Jeopardy Hearing, at] 57-58, 68-69). [Appellant] has seized on this testimony from Detective Kinavey as proof that ADA Pellegrini's written response was intentionally false, but Detective Kinavey never stated at the hearing that he had informed ADA Pellegrini that he had viewed any other surveillance footage, and ADA Pellegrini testified that she did not recall having asked Detective Kinavey whether there was any other available video ([Id. at] 79). For this reason, [Appellant] certainly has not established that the words chosen by the prosecutor were an intentional falsehood made to deceive the court or the defense, and the Commonwealth would respectfully submit that the words

actually lend further support to Judge Rangos' determination that ADA Pellegrini believed that there was no other available video (see [Second Double-Jeopardy Hearing, 9/4/18, at] 35).

Commonwealth's Brief at 41-42. Appellant has not demonstrated an intentional misstatement by ADA Pellegrini. At best, he has demonstrated that the prosecutor and Detective Kinavey were not on the same page regarding the full scope of the detective's investigation of the security footage. While this is unfortunate, it does not suggest that the prosecutor was intentionally trying to mislead the court.

Next, Appellant complains that the prosecutor repeatedly referred to him as a 'con man' during her closing statement:

> In an attempt to impugn the credibility of [Appellant], ADA Pellegrini referred to [Appellant] as a con man (or said he was trying to con someone) fourteen (14) times, in the following statement:
>
>> […]but he's a con man. Uses emotions, his intellect to con people. Did you notice that when he was on the stand and you saw him with the tissue and the[]re were no tears. Not a single tear. See, he conned Gina for the car. Shelly, to mooch off of her, stay at her place, whatever else, whatever else. He conned her into hiding him for two-plus days. He conned Nelena into letting he and Shelly stay in that house. He conned Brenda. She thought he was a nice guy. … He conned [the] mother of his child, Natesha. … He tried to con Detective Kinavey…[.] He's trying to con you with two years and fourteen days of preparation. That's the first time anybody's ever heard that story. … He's trying to con you because he wants to get away with this. He's trying to con you into believing that Brendan Brooks deserved to be killed. He's trying to con you into thinking that his firing the gun at a crowded Eat'n Park on a Friday night is okay. He's trying to con you into thinking that possessing this illegal gun, pulling it out, firing it twice into the body of the victim is not specific intent to kill.

[N.T. Trial] at 601-[]02.

ADA Pellegrini intentionally chose to use a loaded word that is full of a negative context to diminish the character and credibility of [Appellant]. There is nothing in the record to support ADA Pellegrini's use of this word. No witness said that he/she was conned, no witness stated that he/she was swindled, tricked, or persuaded by deception of cajolery by [Appellant]. ADA Pellegrini intentionally chose this loaded word to inflame the passions of the jury and tell them if they believed [Appellant] they fell prey to dishonesty and were duped. This was an intentional choice by ADA Pellegrini to deny [Appellant] a fair trial[;] one such statement could be dismissed as an accident, or not intentional, but fourteen times was an intentional decision by ADA Pellegrini. In fact, during the double[-]jeopardy hearing ADA Pellegrini was asked if any witness stated that [Appellant] conned them, [and] ADA Pellegrini stated that she could not recall anyone stating [Appellant] conned them.

Appellant's Brief at 50-52 (footnotes and quotation marks omitted).

We disagree that these comments clearly evidence an intent to deny Appellant a fair trial.

It is well settled that prosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Because a criminal trial is an adversary proceeding, the prosecution as well as the defense must be allowed reasonable latitude in presenting its case to the jury.

Commonwealth v. Paddy, 800 A.2d 294, 316 (Pa. 2002) (citation omitted).

As discussed above, "[i]n cases where the outcome is controlled by credibility determinations, a prosecutor is permitted to make comments reinforcing the fact that the jury is presented with conflicting accounts." Judy, 978 A.2d at 1024. Here, the trial court determined that the prosecutor's "description of [Appellant] as a 'con man' was based on the evidence

presented, and defense counsel's closing argument, and was fair argument in a case in which the outcome depended upon the credibility of [Appellant]." Opinion at ¶ 21. We agree. Either Appellant was fully truthful in his account of the shooting, lying, or some combination thereof. Appellant takes umbrage to the manner in which the prosecutor effectively called him a liar, but it was the essence of the Commonwealth's case that Appellant's self-defense claim was a lie. Furthermore, Appellant's argument focuses far too much on the fact that the witnesses in this case did not specifically utter the word, "con," in reference to Appellant's statements and conduct. Far more relevant was the fact that the jury had been presented with utterly incompatible accounts of the shooting that could only be reconciled by determining whether or not Appellant was lying, thus making comments on Appellant's truthfulness by the prosecutor both fair and unavoidable. Tellingly, here, Appellant's trial counsel did not object to the prosecutor's repeated use of the term. Thus, again, we ascertain no prosecutorial misconduct. Moreover, even considered as misconduct, we would conclude that it was not so egregious as to suggest a specific intent to deprive Appellant of a fair trial.

Appellant also argues that the prosecutor surreptitiously attempted to admit his prior conviction into evidence during her direct examination of Detective Kinavey and during the cross-examination of Appellant.

> Revelation by a prosecutor of prior criminal activity in addition to being improper as a matter of evidentiary law, may be a basis for a finding of misconduct. In Commonwealth v. Percell, … 454 A.2d 542, 544 ([Pa.] 1982), we stated that "[a] reference, either expressly or by reasonable implication, to prior criminal activity,

which does not qualify as a recognized exception to the general rule excluding evidence of an accused's prior criminal convictions … is impermissible." In addition to finding that the improper reference was made to prior criminal conduct, we found that the prosecutor engaged in misconduct by deliberately injecting an improper matter into the case.

Bricker, 487 A.2d at 352.

Appellant contends that the prosecutor first attempted to expose the jury to evidence of his prior conviction by asking the detective if Appellant was permitted to possess a firearm (which might imply that he had a prior conviction) instead of whether Appellant had a license to carry a firearm. Appellant's Brief at 60. Appellant is referring to the following exchange between the prosecutor and Detective Kinavey:

> Q. Detective, did you determine through the state of Pennsylvania whether this defendant is licensed to carry a firearm?
>
> MR. THOMASSEY: I'll stipulate that he was not, Judge. That's not an issue in this matter.
>
> BY MS. PELLEGRINI:
>
> Q. So through the stipulation, Detective, Commonwealth's Exhibit No. 25, this is issued by the Pennsylvania State Police?
>
> A. Yes.
>
> Q. He is not -- he cannot possess a firearm?
>
> A. That is correct, he cannot possess a firearm.
>
> THE COURT: Wait one second. Jurors, it's a different point. In this proceeding you may hear the word "stipulation." When both sides agree to something being factual, then that's a stipulation, but it's where both parties concede there's a factual basis to which one party is moving forward. All right?
>
> MS. PELLEGRINI: Offer for cross.

N.T. Trial at 280-81 (emphasis added).

- 31 -

Notably, yet again, Appellant complains of alleged misconduct that did not warrant a defense objection during his trial. Thus, this matter has been waived. Nevertheless, we ascertain that Appellant was unlikely to have been significantly prejudiced by the prosecutor's question. That question immediately followed the previous inquiry into whether Appellant was licensed to carry a firearm. Because of that sequence, we seriously doubt the jury would have assumed, as Appellant suggests, that the prosecutor had transitioned from the topic of licensure to implying that Appellant had been convicted of a prior crime that barred him from possessing a firearm. Instead, the jury was more likely to have inferred from Detective Kinavey's answer that Appellant was not permitted to possess a firearm because he was not licensed to do so.

Appellant also contends the prosecutor impermissibly broached the subject of his prior conviction during his cross-examination:

> During cross examination, [Appellant] stated that[,] "In 2000 I had a license to carry a firearm." [N.T. Trial] at 504. Following this statement ADA Pellegrini asked to approach. Id. After approaching, ADA [Pellegrini] stated: "[Appellant] just said that he had a license to carry a gun in 2000. Well, in 2001 … he pled guilty to firearms without a license, and I'd like to - I believe he's opened the door." Id. at 505. Again, ADA Pellegrini is showing that she knows the difference between carrying a firearm without a license, and person not to possess, but more importantly, ADA Pellegrini is attempting to be permitted to impeach [Appellant]'s statement that he had a permit, in 2000, with a 2001 conviction. This is completely improper, because 2001 comes after 2000, and it is entirely possible for someone to have a license in 2000, and not 2001. This shows that ADA Pellegrini simply wanted to place into evidence that [Appellant] had a prior conviction, regardless of how sneaky she had to be in the case.

Appellant's Brief at 60-61.

However, it is clear from the record that the prosecutor did not attempt to surreptitiously expose Appellant's prior conviction to the jury—she immediately requested a sidebar to get a ruling as to whether that door had been opened by Appellant. This was proper, not improper conduct. Appellant cites no case law whatsoever suggesting that a prosecutor cannot make such an argument to the court outside the presence of the jury. Appellant's argument suggests that when a prosecutor loses a legal argument (and then complies with the resulting ruling), that is evidence of misconduct intended to deprive the defendant of a fair trial. Such a conclusion is absurd and, nevertheless, not supported by any case law cited by Appellant. Accordingly, we conclude that this aspect of Appellant's double-jeopardy claim is meritless as well.

Appellant next argues that his retrial should be barred due to the prosecutor's failure to preserve a video of the parking lot outside of the Eat'n Park, which did not show the shooting, but which arguably corroborated part of his account of events. This was precisely the issue for which Appellant was granted a new trial. Nevertheless, Appellant believes that the Commonwealth's conduct with regard to the after-discovered video was so egregious that it evidenced an intent to deprive him of a fair trial. Appellant contends that

> mere hours after the shooting law enforcement knew that there were multiple surveillance cameras at Eat['n] Park. ADA Pellegrini, who is in charge of the investigation and prosecution,

on December 22, in response to a direct discovery request from [Appellant]'s then attorney, stated in a letter to defense counsel that "You were provided with all available video." ADA Pellegrini is responsible for gauging the effect of any failure by police to bring favorable evidence to her attention, and here, she knew that there was at least one other video available, because the police report specifically mentioned camera two. Further, had Ms. Pellegrini contacted one of the detectives on this case, they would have informed her that more video was available. ADA Pellegrini testified that she didn't recall if she asked any of the detectives if there were more videos available. [First Double-Jeopardy Hearing] at 80. Further, numerous crime scene photos show other surveillance cameras both inside and outside of Eat['n] Park. ADA Pellegrini, who was in charge of the investigation and prosecution in this case, certainly would have seen those cameras before she wrote the December 22, 2008 letter to [Appellant]'s attorney stating that all available video had been turned over. Further, [Appellant]'s attorney[] Ms. Kreisman[,] testified that she didn't subpoena any additional video because she thought the Commonwealth would provide her all of the video. [First Double-Jeopardy Hearing] at 23.

Ms. Pellegrini capitalized on her failure to preserve and provide the defense with all of the video in her closing argument. In her closing[,] ADA Pellegrini stated[:] "And what does he do? He goes out to that car and gets that gun, and now he has the great equalizer, the great—this thing right here." [N.T. Trial] at 597. This statement was completely untrue, and the Commonwealth knew that this statement was untrue, as Det. Kinavey testified[:]

> Q: "Now, you watched all the videos in this case?
> A: I did.
> Q: So, the videos don't show [Appellant] going into his vehicle, do they?
> A: It does not show his vehicle, correct."

[First Double-Jeopardy Hearing] at 69.

During the Double-Jeopardy hearing, none of the police officers, [n]or ADA Pellegrini[,] could remember who was the lead detective and who sat at counsel table with ADA Pellegrini during trial. This is important to this case, as in different parts of the case, the detective sitting at counsel table, would have known that ADA Pellegrini was making an untrue statement. For example, if Det. Kinavey was at counsel table, then he would have known that

> ADA Pellegrini was not making a truthful statement when she stated [Appellant] went to his vehicle to get the gun. This not truthful statement by ADA Pellegrini directly contradicts [Appellant]'s testimony in this case. However, as ADA Pellegrini is the individual who is responsible for gauging the effect of not providing the evidence, regardless of any failure by the police, the responsibility for this untrue statement, and ADA Pellegrini's decision to capitalize on her discovery violation, is the responsibility of the prosecutor, ADA Pellegrini.

Appellant's Brief at 64-66.

Here, there is no dispute that the at-issue video should have been given to Appellant in discovery. Indeed, Appellant was granted a new trial due to this very discovery violation. However, the crux of Appellant's double-jeopardy argument is that the prosecutor knew about the video and intentionally lied to the defense when she averred that all security videos had been provided in discovery, or that she suspected or should have known that it existed, but nonetheless intentionally failed to look into the matter so she could use the absence of the video to deprive Appellant of a fair trial.

In denying Appellant's double-jeopardy claim, the trial court rejected this characterization of the prosecutor's actions, determining instead that Appellant "failed to establish intent, bad faith or a motive by the prosecutor to provoke a mistrial or intentionally deprive Appellant of a fair trial by withholding video from other security cameras at Eat'n Park." Opinion at ¶ 14. As the Commonwealth explains:

> At the hearing on [Appellant's double-jeopardy] motion, … ADA Pellegrini testified that she had only ever been given one video from the surveillance cameras at Eat'n Park—the one played by the Commonwealth at trial that depicted the vestibule of the restaurant—and that, when asked about the subject prior to trial

by [Appellant]'s defense counsel at the time, Erika Kreisman, she told Attorney Kreisman that she had provided the defense with all of the video[s] in her possession. [Detective] Kinavey ... testified that he had watched all of the angles of the Eat'n Park surveillance video [N.T. Trial at 57]. Detective Kinavey stated that, after having done so, he collected only the angle from Camera 2—the one that showed the vestibule that captured customers entering and exiting the restaurant—and that he did not ask Eat'n Park to preserve any of the other footage. At a continuation of the hearing about two weeks later, William Moore, the director of safety and security for Eat'n Park Hospitality Group, testified that Eat'n Park does not have a corporate policy as to when surveillance video must be saved, but because of the shooting, he chose to preserve, of his own volition, some of the surveillance footage captured by other cameras at the time of the murder in order to protect the corporation's interests should some sort of issue arise as a result of the shooting. Moore stated that discs containing the video remained in his desk drawer until he received a subpoena from the defense at a point subsequent to [Appellant]'s trial.

Commonwealth's Brief at 18-19. The Commonwealth then contends that, with regard to its concession to a new trial, it was not admitting any error that warranted barring Appellant's retrial:

Appellant took the stand in his own defense at trial and, as far the Commonwealth is concerned, told a fanciful story regarding what led to the death of [the victim]. For instance, [Appellant], in explaining why he was in possession of a gun after maintaining that he did not carry one, said that he just happened to take one from his friend Ramon Bentley that night because he felt that Bentley was too intoxicated to carry it around. The Commonwealth finds this testimony to be incredible, as was [Appellant]'s contention that he believed that there was someone out in the parking lot of the Eat'n Park in a Chevy Blazer who was working in association with Brooks to do him harm. Nevertheless, that was the story that [he] told, and it was ultimately for the jury to determine its veracity. Thus, given that the parking-lot surveillance video arguably provided some support for [Appellant]'s version of events, the Commonwealth, out of a sense of fairness, acknowledged that it was an error in the discovery process for [Appellant] to have gone to trial without having access to the footage. But[,] that is certainly not the same thing as

saying that the Commonwealth believes that the video would have likely produced a different verdict at trial or that the prosecutor had intentionally tried to prevent [Appellant] from having a fair trial.

Id. at 20.

The Commonwealth futher argues:

While this Court has not foreclosed the possibility that misconduct by the police, in addition to the prosecutor, may also warrant the dismissal of charges under a double-jeopardy analysis, "there may be no double-jeopardy dismissal if [the police] misconduct is unintentional or if it does not lead to intentional misconduct of the prosecutor." Commonwealth v. Adams, 177 A.3d 359, 372-73 (Pa. Super. 2017). Here, Detective Kinavey's actions certainly do not rise to the level of intentional misconduct, as his hearing testimony suggested that he saw no evidentiary value in the parking-lot video, a not-unreasonable position given that the video-which, inarguably, does not depict the shooting-does not appear on its surface to have any bearing on the murder. In denying [Appellant]'s motion to dismiss pursuant to double jeopardy, Judge Rangos found credible the testimony of both ADA Pellegrini and Detective Kinavey and ruled that there was no intentional withholding of any video evidence. Thus, because the instant matter clearly does not contain the "deliberate concealment" of evidence found by the Supreme Court in Smith to have established bad faith on the part of the prosecution such that retrial was precluded-in other words, because nobody here hid anything-[Appellant]'s claim as to the video must certainly fail. See also Adams, 177 A.3d at 374 ("Because the trial court found that there was no intentional misconduct or intent to deprive Appellant of a fair trial, and because those findings are supported by the record, we affirm its holding that Appellant is not entitled to have the charges against him dismissed on double jeopardy grounds.").

Commonwealth's Brief at 21-22 (some citations omitted).

We agree with the Commonwealth's analysis. Because the trial court did not find any intent to conceal or destroy exculpatory evidence by either the prosecutor or the police, there are no grounds for barring Appellant's

retrial on double jeopardy principles based on the failure of the Commonwealth to provide the at-issue video during discovery. The discovery violation warranted a new trial where Appellant could present the after-discovered video. However, it did not evidence misconduct that was intentionally designed to deprive Appellant of a fair trial.

Finally, Appellant also maintains that the prosecutor engaged in misconduct by failing to preserve the knife found in the victim's pocket. It is undisputed that a knife was found in the victim's possession after the shooting and that it was subsequently returned to the victim's wife five days after the shooting. Appellant contends that the prosecutor engaged in misconduct by not preserving that evidence, and for ostensibly misleading the jury by repeatedly suggesting that the victim was unarmed when he was shot by Appellant.

We first note that this is a not a matter of after-discovered evidence. Appellant was aware of the victim's possession of the knife at trial, and it is undisputed that such information was disclosed to the defense, and that the failure to preserve the knife was raised by the defense prior to the first trial and before the jury. At trial, one of the Commonwealth's own witnesses, Detective Scott Towne, told the jury of its existence:

> Q. I'm going to show you what I've marked as Defense Exhibits D and E which were turned over in discovery in this case by the District Attorney's Office to me and ask you if you recognize those two items.
>
> A. Yes, I do.

Q. What are they?

A. Defense Exhibit D is a typed receipt from the Allegheny County Police Department as far as items returned to a family member, and Defense Exhibit E is a UPMC Mercy valuables record envelope which would have been collected at the hospital by hospital staff.

Q. So the hospital staff at UPMC Mercy collects things, that's E, gives them to the Allegheny County Police, that's D, who gave them to Linda Brooks, the wife of the deceased. Correct?

A. That's correct.

Q. And you would agree that at the hospital they found a knife on Mr. Brooks that was turned over to the police who turned it over to Mrs. Brooks. That's what the property receipts indicate. Correct?

A. The Defense Exhibit E from UPMC Mercy has one knife, which you have circled, and on the Defense Exhibit D, it has one Mtech, that's M-t-e-c-h, folding pocketknife as one of the items returned to Linda Brooks.

N.T. Trial at 242-43 (emphasis added). Subsequently, during his closing statement, Appellant's trial counsel made the following argument to the jury:

So it seems to me -- it seems to me when [the victim] comes out of the restaurant, he has a phone, they want to say, in his hand. Right? So they got that. So the same place they got the phone, they got the knife. So I expected the District Attorney to bring some detective in here to explain—explain this, explain it to me, please, where the knife went, where did they get it[?] Guess what they did? They ignored it. They ignored it because what they want to do is just say it's another inner-city killing. Just put them all in prison. You can't do that. Don't you let them do that.

Id. at 581.

Thus, while the Commonwealth's failure to preserve the knife constitutes misconduct, it was, nonetheless, discussed at length at trial, its existence was used to buttress Appellant's self-defense claim, and the Commonwealth's failure to preserve it was used by Appellant to discredit the

investigation in the eyes of the jury. Critical to Appellant's self-defense claim was whether the knife was in the victim's hand at the time of the shooting, a claim that was proffered by Appellant alone, but contradicted by the Commonwealth's eye-witnesses. In this context, it appears speculative, at best, that the actual knife would have provided any more value to the defense. Arguably, the Commonwealth's failure to preserve the knife has only served to hurt the prosecution because of the way Appellant's trial counsel was able to exploit that error. We also note that Appellant has failed to discuss any efforts the defense made to recovered the knife from the victim's family over the last 10-11 years; thus, it is not even clear from the record that it is not recoverable.

As to the specific matter at hand—whether the failure to preserve the knife was misconduct intended to deprive Appellant of a fair trial—the trial court determined that Appellant failed to meet his burden of showing that the Commonwealth acted in bad faith by returning the pocketknife to the victim's family. Opinion at 10 ¶ 15. Because it was found in the victim's pocket, Detective Hediger did not believe it to be of evidentiary value. While it was not for Detective Hediger to make such a determination, the trial court nonetheless evaluated his credibility and determined that he did not act to intentionally deprive Appellant of a fair trial. Indeed, the fact that the existence of the knife was documented in the police report supports this determination. Accordingly, although we agree with Appellant that the police

should have preserved the knife for trial, we also agree with the trial court that this misconduct did not justify barring Appellant's retrial.

As discussed above, we additionally conclude that none of the other matters raised by Appellant individually warrant barring his retrial on double-jeopardy grounds. After careful consideration, we are also unconvinced that these matters collectively warrant barring Appellant's retrial. While the prosecutor in this case was at-times overzealous, we see no clear evidence of a specific intent to deprive Appellant of a fair trial, nor evidence of misconduct intended to provoke Appellant into seeking a mistrial. Moreover, we conclude that the prosecutorial misconduct that did occur in this case will be adequately remedied by the new trial that the PCRA court already afforded to Appellant.

II

Next, Appellant argues that "under the doctrine of judicial admissions[,] the Commonwealth is precluded from proceeding on the charge of first-degree murder" at Appellant's new trial. Appellant's Brief at 80 (some capitalization omitted). "Statements of fact by one party in pleadings, stipulations, testimony, and the like, made for that party's benefit, are termed judicial admissions and are binding on the party." John B. Conomos, Inc. v. Sun Co., Inc. (R&M), 831 A.2d 696, 712 (Pa. Super. 2003).

> For an averment to qualify as a judicial admission, it must be a clear and unequivocal admission of fact. Judicial admissions are limited in scope to factual matters otherwise requiring evidentiary proof, and are exclusive of legal theories and conclusions of law. The fact must have been unequivocally admitted and not be merely one interpretation of the statement that is purported to be a judicial admission.

Id. at 713.

Appellant contends that the Commonwealth made a binding judicial admission by conceding that Appellant's after-discovered evidence claim warranted a new trial. The Commonwealth contends that this issue is outside the scope of the double-jeopardy claim certified by the trial court pursuant to 42 Pa.C.S. § 702(b). Section 702(b) provides as follows:

> (b) **Interlocutory appeals by permission.**--When a court or other government unit, in making an interlocutory order in a matter in which its final order would be within the jurisdiction of an appellate court, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter, it shall so state in such order. The appellate court may thereupon, in its discretion, permit an appeal to be taken from such interlocutory order.

42 Pa.C.S. § 702(b).

Here, it is undisputed that the trial court certified that Appellant's double-jeopardy claim was immediately appealable pursuant to Section 702(b). The Commonwealth contends that none of Appellant's remaining claims were certified for interlocutory review and, thus, that this Court lacks jurisdiction to entertain them. The instant issue, however, arguably arises out of the same after-discovered evidence claim that forms a substantial part of Appellant's double-jeopardy claim. Additionally, Appellant seeks the same form of relief—barring retrial. Thus, out of an abundance of caution, we will address this claim on its merits.

As Appellant explains:

Under [the after-discovered evidence test,] a defendant must plead and prove, by a preponderance of the evidence[,] the following four prong test:

1) The evidence could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence;

2)The evidence is not merely corroborative or cumulative;

3)The evidence would not be used solely to impeach the credibility of a witness; and

4) The evidence would likely result in a different verdict if a new trial were granted.

Commonwealth v. Pagan, 950 A.2d 270, 292 ([Pa.] 2008) []. This test is conjunctive, and the defendant must show that each factor has been met. Id. Following the filing [of Appellant]'s PCRA petition, the Commonwealth filed their answer on September 22, 2017. Paragraph four (4) of the Commonwealth's Answer states: "Upon review of the record and the PCRA Petition, the Commonwealth submits that Petitioner is entitled to PCRA relief as to the newly[-]discovered evidence claim; specifically, the newly discovered additional video surveillance." Therefore, the Commonwealth, in their answer admitted that ... it is likely that a first-degree murder conviction is unlikely.

Appellant's Brief at 80-81 (some capitalization omitted).

We disagree. We ascertain no "clear and unequivocal admission of fact" in the Commonwealth's concession that the after-discovered evidence warranted a new trial in this case. The alleged 'fact' conceded—that the evidence would likely result in a different verdict if a new trial were granted—is a fact expressed as a probability, which necessarily includes the possibility that the verdict would be the same after a new trial if the newly-discovered fact were before the jury. Statements about probability of mere likelihood ('more likely than not,' or similar characterizations), are equivocal statements

of fact. Thus, by conceding that Appellant met the requirements of the after-discovered test in his PCRA petition, the Commonwealth only conceded that a new trial might result in a different verdict, not that it can only result in a different verdict. Accordingly, this claim lacks merit.[10]

### III.

Next, Appellant contends that the trial court abused its discretion by permitting the Commonwealth to "reopen" the double-jeopardy hearing, "when the Commonwealth did not provide a reasonable explanation as to why it should be allowed to reopen the hearing." Appellant's Brief at 84-85. Appellant waived this issue.

Initially, we must again address the Commonwealth's assertion that this issue was not certified by the trial court for immediate appeal pursuant to Section 702(b). However, we see no rational reason to divorce a claim related to the process of the trial court in denying Appellant's double-jeopardy claim from the claim itself. Appellant's double-jeopardy claim is properly before this Court at this time and, thus, subsidiary issues involving the process of deciding that issue could be deemed previously litigated or moot in a subsequent direct

---

[10] Additionally, we are not inclined to create a new rule whereby the Commonwealth is disincentivized from yielding to the court's granting of a new trial in cases when potentially exculpatory evidence is discovered after a conviction. Indeed, we commend the Commonwealth for its concession in this case, when it could have presented at least a plausible argument that the after-discovered evidence was not likely to result in a different verdict.

appeal. Thus, we will address the merits of this claim under the umbrella of Appellant's double-jeopardy claim.

Following the first double-jeopardy hearing in this case, the Commonwealth filed a motion seeking to reopen the record. See Commonwealth's Motion to Reopen the Record, 8/27/18. The matter was addressed at the outset of the second double-jeopardy hearing, held on September 4, 2018. The trial court first acknowledged Appellant's objection to reopening the record. N.T., 9/4/18, at 6. Defense counsel then stated that reopening the record "would prejudice the defense" because counsel did not have "an investigator or transcript from the original hearing to use today." Id. Counsel also indicated that the court's denial of IFP status had hampered his ability to cross-examine or rebut the Commonwealth's witness. Id. In direct response to this allegation of prejudice, the trial court twice indicated its willingness to postpone the hearing to allow the defense more time to prepare. Id. at 6, 7. After conferring with Appellant, defense counsel stated that his client wished to proceed, effectively refusing the opportunity to postpone the matter. Id. at 7-8.

In his brief, Appellant asserts that the court did not allow him an opportunity to object to the Commonwealth's motion to reopen. The record plainly belies that assertion, as the court clearly acknowledged Appellant's objection to reopening the record and then offered to postpone the hearing to allow Appellant sufficient time to prepare. Appellant further asserts that reopening the record "precluded the defense from having an opportunity to

meet the additional evidence...." Appellant's Brief at 90. Yet, Appellant fails to assert why the court's offer of a postponement was insufficient to alleviate any prejudice he would suffer by reopening the record to permit a single Commonwealth witness to testify.[11] Indeed, in his brief, Appellant fails to mention or discuss the court's offer to postpone the case at all. On this basis, we conclude that Appellant waived his claim that the trial court erred by permitting the Commonwealth to reopen the record by refusing the court's offer to postpone the matter and electing to proceed with the hearing. Alternatively, even if we considered the merits of his claim, Appellant has failed to convince us that he was prejudiced by the court's decision to reopen the record.

## IV.

Next, Appellant argues that he followed the correct procedure by filing a double-jeopardy motion during the pre-trial proceedings, i.e., that he did not waive his double-jeopardy claim by failing to appeal the PCRA court's order granting him a new trial (which effectively denied the identical double jeopardy claim that was raised in his PCRA petition). We addressed this matter at the outset of Appellant's double-jeopardy claim above, holding that Appellant did not waive the claim by failing to appeal from the PCRA court's order.

_____

[11] Nor does Appellant contend with the fact that the court indicated that the at-issue witness's testimony was unlikely to be of "tremendous consequence" to the double-jeopardy issue. N.T., 9/4/18, at 10-11.

V.

Appellant asserts that the trial court erred in denying him IFP status, which is the sole claim raised under Appellant's appeal filed at 1406 WDA 2018. Appellant, who is currently represented by private counsel, argued below that he was nonetheless entitled to IFP status because he is, and has been, indigent since the outset of his first trial.[12] The Commonwealth argues that this appeal should be quashed, claiming that we lack jurisdiction to entertain it.

> The Superior Court has jurisdiction to entertain appeals taken (1) as of right from a final order, Pa.R.A.P. 341, 42 Pa.C.S. § 742; (2) from interlocutory orders by permission, Pa.R.A.P. 312, Pa.R.A.P. 1311, 42 Pa.C.S. § 702(b); (3) from certain interlocutory orders as of right, Pa.R.A.P. 311; 42 Pa.C.S. § 702(a); and (4) from certain collateral orders, Pa.R.A.P. 313.
>
> A final order is (1) any order that disposes of all claims or of all parties, (2) any order that is expressly defined as a final order by statute, or (3) any order entered as a final order pursuant to subsection (c) of Pa.R.A.P. 341.

*Redevelopment Auth. of Cambria County v. Intl. Ins. Co.*, 685 A.2d 581, 585 (Pa. Super. 1996) (some citations omitted).

In the civil context, our Supreme Court has held that:

> A litigant who is denied the ability to bring a cause of action due to his true inability to pay the costs is effectively put out of court. Because such a denial may close the courthouse door to litigants,

_____

[12] It appears that Appellant's current counsel was retained on Appellant's behalf by a third party after Appellant was awarded a new trial. Appellant posits that "indigency turns on [his] ablity to pay costs and fees, not whether undersigned counsel was court-appointed or privately retained." Appellant's Brief at 96.

they must be permitted to appeal the denial of in forma pauperis status.

Grant v. Blaine, 868 A.2d 400, 402–03 (Pa. 2005).

Instantly, Appellant did not seek permission for an interlocutory appeal by permission pursuant to Section 702(b). Furthermore, none of the special circumstances set forth in Rule 311, Rule 313, or Section 702(a) apply. Thus, we must quash the appeal at 1406 WDA 2018 unless the order denying IFP status constitutes a final order. Applying the test stated above, it is clear that order denying IFP status clearly does not dispose of all claims or any parties. Appellant's trial will proceed with the same charges and same litigants (Appellant and the Commonwealth) regardless of Appellant's IFP status. Additionally, the order denying IFP status is not expressly defined as a final order by any statute, and there is no indication that Rule 341 applies. This suggests that the denial of IFP status is not a final order.

Indeed, Appellant is in no sense 'put out of court' by the order denying IFP status. The Commonwealth has no interest in ending the prosecution, which will continue regardless of Appellant's IFP status. If convicted again, Appellant could challenge the denial if IFP status in a direct appeal from the order of sentence. Thus, Appellant would have another opportunity to challenge the order unless acquitted, in which case the IFP status issue would become moot. Additionally, Appellant might continue to seek IFP status in the trial court if he can prove that he qualifies under the relevant standard. Thus, in no sense is the lower court's order denying IFP status a final order in the

same manner as it is in the civil context, as our Supreme Court held in Grant, supra.

Nevertheless, in Commonwealth v. Lepre, 18 A.3d 1225 (Pa. Super. 2011), this Court, citing "the dearth of case law concerning IFP applications for fees and costs in the context of a criminal case," applied the holding in Grant and consider the merits of an appeal from an order denying IFP status in a criminal case. Id. at 1226. The Lepre decision failed to conduct any separate analysis from Grant in the criminal context; however, to our knowledge, there is no case law that reaches a contrary result. Because of this, we are compelled to conclude that the order denying IFP status is a final, appealable order. Lepre; see also Commonwealth v. Pepe, 897 A.2d 463, 465 (Pa. Super. 2006) ("It is beyond the power of a Superior Court panel to overrule a prior decision of the Superior Court ... except in circumstances where intervening authority by our Supreme Court calls into question a previous decision of this Court."). Thus, we reach the merits of Appellant's claim.

In Appellant's motion for IFP status, he averred that he "is indigent and does not have the ability to pay for the necessary routine costs involved with this case, transcripts, subpoenas, a private investigator, etc...." IFP Motion, 8/16/18, at 2 ¶ 6. The trial court (Judge Cashman) denied the motion because,

> [Appellant] provided nothing but the bald assertion of the question
> of his indigency and did not provide a sufficient basis for this
> [c]ourt to make a determination as to whether or not he was

indigent and did not have the resources to fund his litigation and, accordingly, this [c]ourt denied, without a hearing, his request for the Commonwealth to pay the costs of his litigation.

IFP Opinion, 3/15/19, at 4-5 (emphasis added).

This Court recognized in Lepre that "[i]f a trial court disbelieves the averments in an application to proceed in forma pauperis, it is required to hold a hearing on the application to determine the veracity of the allegations contained therein." Lepre, 18 A.3d at 1227 (quoting Crosby Square Apartments v. Henson, 666 A.2d 737, 738 (Pa. Super. 1995)). However, in both Lepre and Crosby, the appellants had made more specific averments of their financial status. For instance, Lepre had averred that he had "$1,600 in monthly gross income, no assets, an obligation to support one child, monthly rent of $400, and approximately $85,000 in various debts." Lepre, 18 A.3d at 1228.

Nevertheless, neither Lepre nor Crosby were incarcerated at the time they filed their motions for IFP status, whereas it is undisputed in this case that Appellant has been incarcerated since 2008, a condition that Appellant averred in his IFP motion had deprived him of "the ability to work, or otherwise earn any money." IFP Motion at 1 ¶ 4. While that does not necessarily mean that Appellant will qualify for IFP status under the applicable standard, we nevertheless conclude that Appellant has sufficiently "pled a prima facie case of poverty and averred an inability to pay" to warrant an IFP hearing. Lepre, 18 A.3d at 1228. Thus, the trial court's decision to deny Appellant's IFP motion without a hearing constituted an abuse of its discretion. Id.

Accordingly, we vacate the order denying Appellant's motion for IFP status, and remand for a hearing to decide that motion, at which Appellant must be afforded the opportunity to present evidence of his poverty/inability to pay.[13]

VI.

Next, Appellant claims the trial court erred by quashing a defense subpoena served on the Pittsburgh Police Gang Intelligence Unit. It is undisputed that the victim was a member of the Sin City Disciples. The Commonwealth maintains that the Sin City Disciples is a motorcycle club, whereas Appellant alleges that the organization is essentially a criminal gang, or at least, that the Sin City Disciples has a significant criminal element. Appellant further contends his characterization of the Sin City Disciples buttresses his self-defense claim, and that the subpoena was necessary to collect potentially exculpatory evidence to that effect. The Commonwealth avers that we do not have jurisdiction to entertain this claim. We are compelled to agree with the Commonwealth.

_____

[13] We express no opinion at this time regarding the ultimate weight the trial court should afford to the fact that Appellant was provided with private counsel by a third party for his new trial. Such a fact is surely relevant to the trial court's analysis, as the cost of counsel is itself a significant factor in determining his ability to pay the costs associated with his legal defense. However, to our knowledge, there is no case law suggesting that a defendant is not entitled to IFP status when a third party retains counsel on his or her behalf. Accordingly, we leave it to the trial court to address this matter in the first instance.

Appellant did not file an interlocutory appeal from the order quashing his subpoena. On this basis alone, we conclude that we are without jurisdiction to entertain this issue. The matter is simply not before us at this time, despite Appellant's inclusion of the issue in his Rule 1925(b) statement and brief. While we conclude we are without jurisdiction to entertain this matter, we do so without prejudice to Appellant's ability to raise the claim again on any subsequent direct appeal.

Alternatively, to the extent that Appellant alleges that this matter was essential to his double-jeopardy claim, we would still reject it on the merits. Appellant argues that the prosecutor engaged in misconduct at the first trial by characterizing the Sin City Disciples as something other than a criminal gang. He also alleges that the current prosecutor engaged in misconduct by refusing to stipulate that Sin City Disciples were 'at least 1% criminal' for purposes of the new trial and/or double-jeopardy hearing.[14]

Regarding the prosecutor's statements during trial, even if those statements constituted prosecutorial misconduct, we cannot imagine a scenario in which that fact would have been critical in our determination of whether Appellant is entitled to a new trial, or whether barring retrial would

_____

[14] Appellant buttresses these arguments by asserting that the Sin City Disciples are listed as a criminal gang by federal authorities. However, Appellant fails to direct this Court's attention to where this fact is supported by the certified record. Nevertheless, even if accepted as true, this fact would not alter the following analysis.

be warranted on double jeopardy grounds. At the very most, we would consider it to have warranted a new trial in conjunction with the other acts of prosecutorial misconduct, relief for which has already been granted.[15] As to Appellant's complaint that the prosecution refuses to stipulate to the criminality of the Sin City Disciples, we observe that the Commonwealth has no legal nor ethical duty whatsoever to stipulate to any fact, much less a fact under contention. Accordingly, even if we had jurisdiction to entertain this matter as a subsidiary issue of Appellant's double-jeopardy issue, and even if it demonstrated prosecutorial misconduct, it would still not convince us that Appellant is entitled to relief beyond his already-granted new trial.

## VII.

Finally, Appellant argues that the trial court erred when it refused to provide him with funds for a gang expert to substantiate his allegations about the Sin City Disciples. However, Appellant does not allege that the court refused to hear expert testimony to that effect, only that the court refused to pay for it. Consequently, this issue does not pertain to the merits of Appellant's double-jeopardy claim at all, and instead falls under the rubric of his IFP claim. Thus, whether Appellant is entitled to such an expert paid for by the court hinges, at least in part, on whether Appellant is entitled to IFP

---

[15] We note that proving that the Sin City Disciples is a criminal gang does not vindicate Appellant's self-defense claim. At best, it provides some support for Appellant's contention that he was fearful of the victim, which might affect a jury's credibility assessment of his state of mind when he shot the victim. However, even if the jury believed that the victim was a member of a gang, it could still have determined that Appellant did not act in self-defense.

status. As we are remanding for the court to reconsider Appellant's IFP status, Appellant may present this matter again before the trial court following its determination.

However, for purposes of Appellant's double-jeopardy claim, and for the same reasons discussed with regard to Appellant's previous issue, we would still conclude that Appellant's second trial should not be barred on double-jeopardy grounds merely because the prosecutor mischaracterized the nature of the Sin City Disciples organization, even if Appellant could have proven through expert testimony that it is a criminal organization.

Order affirmed at 1405 WDA 2018. Order vacated at 1406 WDA 2018. Case remanded for a hearing to determine if Appellant is entitled to IFP status. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/24/2020